1  Steven Forbess, SID #5968485

2  Two Rivers Correctional Institution

3  82911 Beach Access Road

4  Umatilla, OR. 97882

5

6  IN THE UNITED STATES DISTRICT COURT

7  FOR THE DISTRICT OF OREGON

8  PENDLETON DIVISION

9

10  STEVEN CHARLES FORBESS                    )

11            Plaintiff, pro se.              )     Civil Case No. 2:22-cv-00506-YY

12                                            )

13                                            )

14                                            )     CIVIL RIGHTS COMPLAINT

15                                            ) 42 U.S.C. § 1983; Denial of adequate

16                                            ) Medical Care; Deliberate Indifference; Restricted

17                        v.                  ) Capacity; Intentional Infliction of Severe

18                                            ) Emotional Distress; and violations under 42

19                                            ) U.S.C.A. § 12132, Americans with Disabilities

20                                            ) Act of 1990 § 202, and 29 U.S.C.A. § 794.

21  OREGON DEPARTMENT OF CORRECTIONS, )

22  an agency of the State of Oregon; and     )

23                    Defendant (s), et.al.,  )     JURY TRIAL DEMANDED

24  Dr. WARREN ROBERTS; (O.D.O.C.) Medical    )

25  Director and Chairperson of the Therapeutic )

26  Level of Care Committee. A.K.A. (T.L.O.C.), )

27  sued in his individual and professional capacity. )

28                        Defendant,          )

29  Dr. GARTH G. GULICK, (O.D.O.C.) physician, )

30  Eastside Medical Director, and (T.L.O.C.) Committee )

31  member, sued in his individual and professional capacity.)

32                        Defendant,          )

Page - 1 of  47    CIVIL RIGHTS COMPLAINT  42 U.S.C. § 1983,  29 U.S.C.A § 794

1    Mr. PATRICK MANEY, (O.D.O.C.) Nurse Practitioner,  )
2    and (T.R.C.I.) Chief Medical Officer and health services )
3    (T.L.O.C.) committee member, sued in his                )
4     individual and professional capacity,                  )
5                              Defendant,                    )
6    Dr. KEITH WHITE, (O.D.O.C.) Physician,                  )
7     and Health Services (T.L.O.C.) Committee Member,       )
8     sued in his individual and professional capacity,      )
9                              Defendant,                    )
10   BATTLE,  (O.D.O.C.), Health services (T.L.O.C.) Committee )
11   member, sued in individual and professional capacity,   )
12                            Defendant,                     )
13   Dr. BEAMER M.D. (O.D.O.C.) Health Services (T.L.O.C.) )
14   Committee member, sued in his individual and professional )
15   capacity,                  Defendant,                   )
16   Ms.           DAVIES, (O.D.O.C.) Nurse Practitioner     )
17   and Health Services (T.L.O.C.) Committee member,        )
18   sued in her individual and professional capacity,       )
19                            Defendant,                     )
20   DROLLINGER,  (O.D.O.C.) Health Services (T.L.O.C.)      )
21   Committee member, sued in individual and professional capacity,)
22                            Defendant,                     )
23   REYNOLDS, (O.D.O.C.) Health Services (T.L.O.C.) Committee )
24   member, sued in individual and professional capacity,   )
25                            Defendant,                     )
26   Ms.        HOLDEN, R.N. (O.D.O.C.) Health Services      )
27   (T.L.O.C.) Committee member, sued in                    )
28   Individual and professional Capacity,                   )
29                            Defendant,                     )
30   Mr. MICHAEL GOWER, (O.D.O.C.) Assistant                 )
31   Director, sued in individual and professional capacity. )
32                            Defendant,                     )
33   ALDRIGE, (O.D.O.C.) Health Services (T.L.O.C.) Committee)
34   member, sued in individual and professional capacity,   Defendant, )

| | |
|---|---|
| 1 | STRACK, (O.D.O.C.) Health Services (T.L.O.C.) Committee ) |
| 2 | member, sued in individual and professional capacity,    ) |
| 3 |                                    Defendant,        ) |
| 4 | PRICE, (O.D.O.C.) Health Services (T.L.O.C.) Committee   ) |
| 5 | member, sued in individual and professional capacity.    ) |
| 6 |                                    Defendant,        ) |
| 7 | BLOOD, (O.D.O.C.) Health Service (T.L.O.C.) Committee   ) |
| 8 | member, sued in individual and professional capacity,    ) |
| 9 |                                    Defendant,        ) |
| 10 | Dr. EVERS, (O.D.O.C.) Health Services (T.L.O.C.) Committee ) |
| 11 | member, sued in individual and professional capacity,    ) |
| 12 |                                    Defendant,        ) |
| 13 | DRAVIS, (O.D.O.C.) Health Services (T.L.O.C.) Committee   ) |
| 14 | member, sued in individual and professional capacity,    ) |
| 15 |                                    Defendant,        ) |
| 16 | SUNDSTROM, (O.D.O.C.) Health Services (T.L.O.C.) Committee) |
| 17 | member, sued in individual and professional capacity,    ) |
| 18 |                                    Defendant,        ) |
| 19 | Ms. PAMELA NAMENYI, (O.D.O.C.) Nurse practitioner and) |
| 20 | Health Services (T.L.O.C.) Committee member, sued in    ) |
| 21 | individual and professional capacity,                ) |
| 22 |                                    Defendant,        ) |
| 23 | LINDA BONO, (O.D.O.C.) Nurse Practitioner and Health  ) |
| 24 | Services (T.L.O.C.) Committee member, sued in individual ) |
| 25 | and professional capacity,                        ) |
| 26 |                                    Defendant,        ) |
| 27 | Ms. MENDOZA, (O.D.O.C.) Nurse Practitioner and Health) |
| 28 | Services (T.L.O.C.) Committee member, sued in individual ) |
| 29 | and professional capacity,                        ) |
| 30 |                                    Defendant,        ) |
| 31 | Ms. CINDY DIETER, (O.D.O.C.) (T.R.C.I.) Nurse Manger ) |
| 32 | and Health Services Manager, and sued in individual and   ) |
| 33 | professional capacity,                Defendant,        ) |
| 34 | |

1    Ms. S. JOHNSTON, (O.D.O.C.) Registered Nurse and former  )
2    (T.R.C.I.) Health Services Manager and current Nurse           )
3    Manager, sued in individual and professional capacity,          )
4                                    Defendant,                            )

5                                DEFENDANTS

6                                        1.

7    A. Have you brought any other action or appeal in a Court of the United States while a prisoner?

8                 Yes__X__                          No_____

9                                        2..

10   B. Place of Confinement:  TWO RIVERS CORRECTIONAL INSTITUTION

11   C.  Is there a grievance procedure in this institution?     YES__X___              NO_____

12   D.  Have you filed a grievance concerning the facts relating to this complaint? YES_X___  NO____

13   E.   Is the Grievance Process Completed?              YES___X___          NO_____

14   For his complaint against defendants, STEVEN CHARLES FORBESS alleges as Follows:

15                            NATURE OF ACTION

16                               JURISDICTION

17                                        3.

18        Plaintiff brings this lawsuit pursuant to 42 U.S.C.  §  1983 and 29 U.S.C.A. § 794. This Court has

19   jurisdiction under 28 U.S.C. § § 1331 and 1343 (a) (3), and 1343 (a) (4), because subject matter jurisdiction

20   exist, because the first claim for relief arises under the U.S. Constitution and laws of the United States. This

21   Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367 (a). Plaintiff also seeks

22   a declaratory judgment pursuant to 28 U.S.C. § 2201. Plaintiff is seeking relief for damages arising from the

23   defendant's deliberate indifference to his serious medical needs. This indifference constitutes cruel and unusual

24   punishment , in violation of the Eighth Amendment of the United States Constitution. Plaintiff alleges that

25   defendants were employed at all relevant times by the Oregon Department of Corrections, have committed

26   Deliberate Indifference, negligence, Restricted Capacity, and intentional infliction of emotional distress by

27   denying plaintiff proper medical treatment, and deliberately documenting false information about what is said

28   at his doctors appointments and offering false information about the seriousness of his medical conditions and

29   down playing the severity of his medical conditions by falsely claiming the injuries can not be treated and the

30   seriousness of the plaintiff's severe pain. The defendant's misconduct was for the purpose to prevent the

31   plaintiff from legal recourse for the defendant's bad actions and to prevent plaintiff from getting the medical

32   treatments that he needs. Plaintiff seeks declaratory, compensatory and punitive damages as well as injunctive

33   relief for these violations of his U.S. Constitutional Civil Rights under the 8th Amendment.

VENUE

4.

The District of Oregon is an appropriate venue under 28 U.S.C. § 1391 (b) because all of the events giving rise to the plaintiff's claims occurred in this judicial district and all defendants reside in this judicial district. Specifically, the acts and practices alleged herein occurred at the Two Rivers Correctional Institution, in Umatilla, Oregon.

PARTIES

5.

Name of Plaintiff: STEVEN CHARLES FORBESS,  State Security Identification No. #5968485, Address: Two Rivers Correctional Institution, 82911 Beach Access Road, Umatilla, OR. 97882

6.

At all relevant times, Defendant  Dr. Warren Roberts, was employed as the (O.D.O.C.) Medical Director and the Heath Services (T.L.O.C.) committee chair person, by the Oregon Department of Corrections, 2575 Center St., N.E., Salem, OR. 97301. At all relevant times, defendant was acting within the scope of their employment, and under the color of State and federal Law.

7.

At all relevant times, Defendant Dr. Garth Gulick M.D., was employed as the Eastside ODOC Medical Director and a Health Services (T.L.O.C.) committee member, by the Oregon Department of Corrections and was the Plaintiff's Primary Care provider. At all relevant times, the defendant was acting within the scope of his agency or employment, and under color of State and federal Law

8.

At all relevant times, Defendant Mr. Patrick Maney, was employed as a Nurse Practitioner and the plaintiff's Primary Care provider and a Health Services (T.L.O.C.) committee member at Two Rivers Correctional Institution, and employed by the Oregon Department of Corrections. At all relevant times, the defendant was acting within the scope of his employment and under color of State and federal Law

9.

At all relevant times, Defendant Dr. Keith White, M.D, was employed as a physician and a Health Services (T.L.O.C.) committee member, by the Oregon Department of Corrections. At all relevant times, the defendant was acting within the scope of his employment, and under color of State and federal Law.

10.

At all relevant times, Defendant Battle was employed as a Health Services (T.L.O.C.) Committee member by the Oregon Department of Corrections. At all relevant times, the defendant was acting within the scope of his employment, and under the color of State and federal Law.

11.

Page - 5 of  47     CIVIL RIGHTS COMPLAINT  42 U.S.C. § 1983,  29 U.S.C.A § 794

1    At all relevant times, Defendant Beamer was employed as a Health Services (T.L.O.C.) Committee
2    member by the Oregon Department of Corrections. At all relevant times, the defendant was acting within the
3    scope of their employment, and under the color of State and federal Law.
4                                                      12.
5    At all relevant times, Defendant Ms. Davies , was employed as a Health Services (T.L.O.C.)
6    Committee member, by the Oregon Department of Corrections. At all relevant times, defendant was acting
7    within the scope of their employment, and under the color of State and federal Law.
8                                                      13.
9    At all relevant times, Defendant Drollinger, was employed as a Health Services (T.L.O.C.) Committee
10   member by the Oregon Department of Corrections. At all relevant times, defendant  was acting within the
11   scope of their employment, and under the color of State and federal Law.
12                                                     14.
13   At all relevant times, Defendant Reynolds, was employed as a Health Services (T.L.O.C.) Committee
14   member by the Oregon Department of Corrections. At all relevant times, defendant was acting within the
15   scope of their employment, and under the color of State and federal Law.
16                                                     15.
17   At all relevant times, Defendant R.N. Mrs. Holden, was employed as a Nurse and a Health Services
18   (T.L.O.C.) Committee member by the Oregon Department of Corrections. At all relevant times, defendant was
19   acting within the scope of their employment, and under the color of State and federal Law.
20                                                     16.
21   At all relevant times, Defendant Mr. Michael Gower, was employed as an Assistant Director, by the
22   Oregon Department of Corrections, 2575 Center St., Salem, OR. 97301. At all relevant times, defendant was
23   acting within the scope of their employment, and under the color of State and federal Law.
24                                                     17.
25   At all relevant times, Defendant Aldrige, was employed as a Health Services (T.L.O.C.) Committee
26   member by the Oregon Department of Corrections. At all relevant times, defendant was acting within the
27   scope of their employment, and under the color of State and federal Law.
28                                                     18.
29   At all relevant times, Defendant Strack, was employed as a Health Services (T.L.O.C.) Committee
30   member by the Oregon Department of Corrections. At all relevant times, defendant was acting within the
31   scope of their employment, and under the color of State and federal Law.
32                                                     19.
33   At all relevant times, Defendant Price, was employed as a Health Services (T.L.O.C.) Committee
34   member by the Oregon Department of Corrections. At all relevant times, defendant was acting within the

1   scope of their employment, and under the color of State and federal Law.

2                                    20.

3         At all relevant times, Defendant Blood, was employed as a Health Services (T.L.O.C.) Committee

4   member by the Oregon Department of Corrections. At all relevant times, defendant was acting within the

5   scope of their employment, and under the color of State and federal Law.

6                                    21.

7         At all relevant times, Defendant Dr. Evers, was employed as a Health Services (T.L.O.C.) Committee

8   member by the Oregon Department of Corrections. At all relevant times, defendant was acting within the

9   scope of their employment, and acting under the color of State and federal Law.

10                                   22.

11        At all relevant times, Defendant Dravis, was employed as a Health Services (T.L.O.C.) Committee

12  member by the Oregon Department of Corrections. At all relevant times, defendant was acting within the

13  scope of their employment, and acting under the color of State and federal Law.

14                                   23.

15        At all relevant times, Defendant Sundstrom, was employed as a Health Services (T.L.O.C.) Committee

16  member by the Oregon Department of Corrections. At all relevant times, defendant was acting within the

17  scope of their employment, and acting under the color of State and federal Law.

18                                   24.

19        At all relevant times, Defendant Pamela Namenyi, was employed as a Nurse Practitioner and a Health

20  Services (T.L.O.C.) Committee member by the Oregon Department of Corrections. At all relevant times,

21  defendant was acting within the scope of their employment, and under the color of State and federal Law.

22                                   25.

23        At all relevant times, Defendant Linda Bono, was employed as a Nurse Practitioner and a Health

24  Services (T.L.O.C.) Committee member by the Oregon Department of Corrections. At all relevant times,

25  defendant was acting within the scope of their employment, and under the color of State and federal Law.

26                                   26.

27        At all relevant times, Defendant Mendoza, was employed as a Nurse Practitioner and a Health

28  Services (T.L.O.C.) Committee member by the Oregon Department of Corrections. At all relevant times,

29  defendant was acting within the scope of their employment, and under the color of State and federal Law.

30                                   27.

31        At all relevant times, Defendant Cindy Dieter, was employed as a T.R.C.I. Nurse Manager and Health

32  Services Manager and (T.L.O.C.) Committee member by the Oregon Department of Corrections. At all

33  relevant times, defendant was acting within the scope of their employment, and under the color of State and

34  federal Law.

28.

At all relevant times, Defendant Ms. S. Johnston, was employee as a (TRCI) Nurse Manger, a Health Services Manager and a (T.L.O.C.) Committee member by the Oregon Department of Corrections. At all relevant times, defendant was acting within the scope of their employment, and acting under the color of State and federal Law.                                              29.

The Defendant's named in paragraphs 6. through 28., that are listed above are herein thereafter referred to as the "O.D.O.C." defendants.

30.

INTRODUCTION

This is a Civil Rights action concerning the defendants deliberate indifference to the plaintiff serious medical needs. The plaintiff is incarcerated by defendant Oregon Department of Corrections (ODOC). Plaintiff suffers from severe nerve pain throughout his legs (worse on the left side because of a pinched nerve of the left side of his lower spine that is caused by no foraminal height on the left side of his lower spine between L4 to S1). The plaintiff also has severe nerve pain in his groin area and some pain in his feet that is the result from a cascade of medical conditions and injuries, including previous back surgeries and age related spinal degeneration of his entire spine as the result of having his spine fused from T1 to L4 with a Harrington rod at age 15, because of a diagnosis of severe scoliosis. ODOC medical staff, including Dr. Warren Roberts, Dr. Garth Gulick, Dr. Keith White and also Nurse practitioners, Mr. Patrick Maney, Ms. Bono, Ms. Pamela Namenyi, Ms. Mendoza and TRCI Health Services Managers Ms. Cindy Dieter and Ms. S. Johnston and the (TLOC) committee members are all aware of the plaintiff's current serious medical conditions and severe nerve pain caused by these spinal injuries, but (ODOC) Health Services refuses to provide the plaintiff with adequate pain management for his severe medical spinal injuries and also the injuries to his right hand and wrist. Despite this fact, Dr. Gulick, Dr. Roberts and the (TLOC) committee, at Dr. Gulick's request, abruptly discontinued Plaintiff's pain medications without warning or without an adequate medical justification for their actions, which has resulted in causing the plaintiff increased severe nerve pain and withdrawal effects. The defendants have used the state of emergency powers granted by the Oregon Governor Ms. Kate Brown, citing the Covid-19 pandemic, as the reason for doing this, to deny the plaintiff with adequate medical care. On March 13, 2020, the Oregon Department of Corrections issued a declaration stating their intentions to stop all family visits, religious services from the outside, elective surgeries and other activities, because of this state of emergency that was declared by the Oregon Governor. The ODOC Health Services administration took the state of emergency order to the extreme by canceling all sick call and doctor appointments, except in cases that they referred to as; (Emergent/Urgent) cases. All of the plaintiff's pending outside and inside doctors visits were canceled. The (ODOC) prison doctors decided to abuse the Governor's state of emergency declaration as an opportunity to take the plaintiff's pain medications away from him too, because they knew the plaintiff

1  could not fight the issue because all self-purchase outside independent medical doctors' exams and attorney
2  visits had been indefinitely canceled because of the Covid-19 pandemic. The plaintiff had one outside self-
3  purchase of medical care exam canceled indefinitely as the result of this state of emergency. The defendant's
4  continue to refuse to let the plaintiff see any outside independent physicians on a self-pay basis, by using this
5  Covid-19 issue as an excuse to do so. The defendant's are preventing the plaintiff from seeing independent
6  medical professional who could learn that the prison doctors are abusing the plaintiff by denying him adequate
7  medical care for his serious medical conditions. As such, Plaintiff seeks damages and injunctive relief as well
8  as his attorney fees and costs.

9                                    GENERAL FACTUAL ALLEGATIONS

10      31.    Plaintiff is fifty-nine years old and has a history of scoliosis since the age of twelve. Plaintiff has
11  undergone several back surgeries beginning at age fifteen, which involved a full spinal fusion from T-1 to L-4
12  with a Harrington rod. In 1986, a surgeon removed the Harrington rod in order to repair the broken fusion at
13  L3-4. In 1998, after having new issues with back pain again, he underwent another attempt to fuse his spine at
14  L3-4, this time having a reverse interbody fusion using ray cages to refuse L3-4, because it was discovered that
15  he had a broken fusion at L3-4 again. In 2008, an MRI showed that one of the ray cages on the left side had
16  protruded into his spinal canal 1cm and was compressing on his spinal cord. This had caused extreme back
17  pain for years. This new injury resulted in a 2009 back surgery at OHSU to remove the protruding ray cage
18  and install pedicle screws on both sides. Since the 2009 surgery, the plaintiff has not been able to place weight
19  on his left leg because of a severely pinched nerve on the left side of his lower back and so has been unable to
20  walk. As such, the plaintiff has had to use a wheelchair for mobility. In 2015, Plaintiff had his 2013 lumbar
21  MRI images, his 2014 lumbar CT scan images and his 2015 thoracic spine CT scan images and his 2015
22  standing and supine scoliosis x-ray images along with numerous other lumbar spinal x-rays images, studied by
23  an independent scoliosis specialist, Dr. Hooman Melamed, in Marina del Ray, California.

24      32.    On 3/18/16, Dr. Melamed provided a diagnosis for the plaintiff's spine. He stated that he
25  disagreed with the previous diagnosis that the plaintiff suffers from flat back syndrome. Dr. Melamed stated
26  that the plaintiff's had significant scoliosis that had likely worsened again after the removal of the Harrington
27  rod. Due to the patient's spinal curvature, his spine had fused in a coronal imbalance that was deviated to his
28  right side and this coronal imbalance had caused left side disc space narrowing with the complete loss of left
29  side foraminal height in his thoracic and lumbar spine. Dr. Melamed said that the plaintiff needed a extensive
30  revision scoliosis surgery that would be required in order to alleviate his symptoms. Dr. Melamed was aware
31  of the plaintiff's complaints that he had pinched nerve pain on his lumbar left side that had prevented him from
32  being able to walk when he made this assessment for back surgery and discussed the plaintiff's symptoms. Dr.
33  Melamed stated that the plaintiff needed to find a spine surgeon in his local area who specializes in scoliosis
34  correction and revision spine surgeries and the patient should have further evaluation by such a spine specialist

1  including a physical examination and possibly additional testing. At the time of Dr. Melamed's 3/18/16
2  diagnosis, the plaintiff's upper and lower scoliosis curves were both 30 degrees each. As of 10/21/21, the
3  curvature in plaintiff upper spine has increased to 32.6 degrees and the bottom curve had increased to 47.7
4  degrees. The condition of the plaintiff scoliosis has become much worse than it was in 2015.

5       33.    On October 29, 2019, the plaintiff learned from Dr. Warren Roberts that he had cervical
6  spondylosis involving central canal stenosis that was putting pressure on his spinal cord and multiple level
7  discogenic degenerative changes and facet arthropathy with a moderate bony compromise of the left neural
8  foramen. This caused nerve pain in the plaintiff's left arm and also constant pain and muscle spasms in his
9  neck. On March 16, 2020, plaintiff was scheduled to see Dr. Roberts for a follow-up visit regarding his
10 cervical spondylosis. Dr. Roberts' trip was canceled and never rescheduled. Plaintiff was informed that the
11 baclofen medication he had been taking for approximately six years to manage his muscle spasm in his neck
12 and back had been immediately discontinued.

13      34.    On March 12, 2020, Mr. Jeff Snell, a physical therapist under contract with ODOC, looked over
14 some of plaintiff's medical records. Upon reading those records, Mr. Snell told plaintiff that he had a pinched
15 nerve in his back and no amount of physical therapy was going to fix a pinched nerve. Mr. Snell told plaintiff
16 that he needed back surgery. Plaintiff filed a grievance against Dr. DiGuilio, Dr. Patton, Dr. Norton and the
17 TLOC committee on 3/23/20, because those ODOC defendants had been telling plaintiff for years that he had
18 no evidence of a pinched nerve in his low back and that was why they were denying him a consult with a
19 scoliosis specialist. This was grievance #TRCI-2020-03-128. The final grievance response on 7/15/20 claimed
20 that Mr. Snell was outside of his scope of practice and unqualified to make such a diagnosis. The grievance
21 response claimed that their was no medical evidence that plaintiff had a pinched nerve in his low back.

22      35.    On March 17, 2020, plaintiff was not provided with any Baclofen at medication line and was
23 told that his baclofen had been discontinued. Later, plaintiff learned that the TLOC committee at the
24 recommendations of Dr. Warren Roberts had suddenly and without warning discontinued his baclofen
25 prescription even though the plaintiff had over a month left on his current prescription. The baclofen had been
26 first prescribed to the plaintiff by Dr. Norton in 2014, because a radiologist found in neck X-rays taken on
27 6/10/14, that plaintiff had a reverse curvature in his neck that was likely caused from muscle spasms. The
28 plaintiff had been reporting severe muscle spasms in his neck for months to Dr. Norton, so because of the
29 recent neck X-ray findings, he felt that plaintiff needed to be on baclofen to control these muscle spasms. The
30 plaintiff's last cervical spine MRI was on October 7, 2019, and this MRI revealed multilevel discogenic
31 degenerative changes and facet arthropathy throughout the neck and moderate canal stenosis at C3-4 with
32 moderate bony compromise of the left neural foramen. The plaintiff is slowly losing the use of his left arm
33 because of this and with the increased severe muscle spasms as the result of taking the baclofen away from the
34 plaintiff, this has caused the plaintiff's cervical stenosis to become worse. The plaintiff had sent in many health

1  care requests, including on March 17th, 18th, 22nd and 23rd, 2020, expressing his concerns with having his

2  baclofen prescription suddenly discontinued, in which the plaintiff described his increased pain and muscle

3  spasms and insomnia, which were withdrawal effects from having a long-standing medication discontinued

4  without notice, explanation, or gradual reduction of the dosage.

5      36.    On March 18, 2020, the healthcare request form the plaintiff submitted, described the symptoms

6  he was having as the result of being taken off Baclofen, including headaches, muscle spasms, insomnia and

7  dizziness. On March 22, 2020, the plaintiff submitted a health care request stating that he was still

8  experiencing constant pain, muscle spasms and insomnia. On March 24, 2020, the plaintiff reported

9  experiencing additional symptoms of headaches, upset stomach and severe neck pain and increased muscle

10  spasms coming from his lumbar spine. The plaintiff's complaints of withdrawal effects were completely

11  ignored. The plaintiff filed grievance #TRCI-2020-03-132 on March 26, 2020, against the TLOC committee,

12  RN S. Johnston, NP Patrick Maney and Dr. Warren Roberts for suddenly stopping the baclofen and causing the

13  plaintiff to experience severe withdrawal symptoms and because the plaintiff still needed the baclofen for

14  severe muscle spasms in his neck and back, which was necessary to treat, especially because of the diagnosis

15  on October 29, 2019, when Dr. Warren Roberts said the plaintiff had cervical spondylosis and stenosis that was

16  causing his spinal cord at C3-4 to become pinched, and his left nerve root at C3-4 to also become impinged

17  upon. On March 26, 2020, the ODOC Medical Director Christopher DiGuilio responded to the first level

18  grievance appeal. He stated: "It also states possible side effects of taking Baclofen are listed almost the same

19  as possible side effects of stopping and possible withdrawal effects: hallucinations, seizures, headaches, sleep

20  problems (insomnia), among others" The plaintiff had been taking Baclofen for six years straight without

21  experiencing any of those side effects. It was only when the medication was abruptly stopped that the plaintiff

22  experienced horrible withdrawal effects of increased pain, muscle spasms and insomnia. The plaintiff appealed

23  the grievance appeal response, writing, "I still have muscle spasms when I am taking Baclofen, but I

24  discovered that I have even worse muscle spasms when I am not taking the Baclofen." On March 18, 2020,

25  TRCI Health Services Manager RN S. Johnston gave a written response to the plaintiff's March 17th healthcare

26  request which stated: "Your Medication change was per Dr. Roberts order, He increased your ultram and he

27  discontinued your baclofen as he believes that this will better meet your medical needs. You do have a follow-

28  up appointment with Dr. Roberts." On March 25, 2020, RN S. Johnston responded to the 3/23/20 healthcare

29  request, stating; "Please note that nobody denies you have pain. The provider has discontinued the baclofen

30  and he does not want to restart it at this time." It appeared as if this was being done on purpose to hurt the

31  plaintiff. No follow-up exam with Dr. Roberts has occurred. The ultram was not increased.

32      37.    On April 2, 2020, the plaintiff had lumbar spine X-rays taken at TRCI Health Services. The

33  Radiologist at Blue Mountain Diagnostic Imaging studied these X-rays and wrote a report. This 4/2/20 X-ray

34  report showed spinal stenosis at L5-S1, and a broken fusion at L3-4, that was made evident by a broken

1   pedicle screw at L-4. Dr. Gulick examined this X-ray report on April, 30, 2020. Dr. Gulick met with the
2   plaintiff and never bothered to inform him that he had a broken pedicle screw in his lower spine. Dr. Gulick
3   simply told the plaintiff, "This X-ray report tells me that you must be living in a lot of pain. I can understand
4   why you want more pain medications." Dr. Gulick renewed the plaintiff's Baclofen prescription through July 6,
5   2020.

6          38.       On April 30, 2020, the plaintiff had an appointment with Dr. Gulick. Dr. Gulick told the
7   plaintiff that there was no good reason why the plaintiff should continue taking the pain medications that were
8   not on the formulary any longer and he would not be receiving any further back surgeries because the surgery
9   he needed was considered experimental and the ODOC does not owe him a scoliosis surgery. Dr. Gulick went
10  on to tell the plaintiff; **"It does not matter what we do to you. You have always been in pain from your**
11  **back. Even if you had back surgery, you would still be in terrible pain. You are going to die in terrible**
12  **pain. All that matters is what I am going to do with you until then."** On 4/30/20, Dr. Gulick told plaintiff
13  that Dr. Roberts did not need to personally exam him in order to diagnose his spine, because Dr. Roberts could
14  just study plaintiff's imaging to diagnose him. Until this day, all the prior ODOC prison doctors who had
15  previously treated the plaintiff, had told plaintiff that Dr. Hooman Melamed's 3/18/16 spinal diagnosis was no
16  good because he did not personally examine the plaintiff and because Dr. Melamed only used imaging to
17  diagnose his back condition. Plaintiff filed Grievance #TRCI-2020-05-074 over this new information from Dr.
18  Gulick. The final appeal was completed on 2/8/21.

19         39.       On May 5, 2020, Dr. Gulick recommended a reduction in the plaintiff's pain medication
20  Ultram from 300 mg daily to 100 mg daily and to reduced the plaintiff's nerve pain medication Neurontin from
21  800 mg three times daily to 600 mg at each dose to the TLOC committee and they approved Dr. Gulick's
22  recommendation.

23         40.       On May 10, 2020, the plaintiff was denied his usual dose of Trammadol-Ultram in the
24  morning and afternoon. The plaintiff experienced a fall that day and did not sleep due to severe burning nerve
25  pain in his lower extremities. The next day the plaintiff sent in a health care request, stating; "I think I broke a
26  fusion again or broke something and I should be X-Rayed to see what is wrong. ...I need more pain medication
27  not less. My severe nerve pain in my legs and groin area gets so bad that I will greatly suffer with agonizing
28  pain at peak times." The plaintiff requested to see a different doctor.

29         41.       On May 18, 2020, the plaintiff sent in a healthcare request. He wrote that he had begun the
30  reduced dosage of Neurontin-Gabapentin and his nerve pain from the reduced dosage was immense. The
31  plaintiff had been taking neurontin for seventeen years at 800 mg before Dr. Gulick and the TLOC committee
32  decided to reduce the dosage on 5/10/20. Plaintiff filed grievance #TRCI-2020-05-138 on May, 21, 2020 as the
33  result of Dr. Gulick's actions of taking his nerve pain medication away from him which was causing him
34  increased urinary restriction and more frequent use of a Catheter. The final appeal was completed on 12/3/20.

1    The assistant Medical Director denied that the taking away of the plaintiff Neurontin and prescribing him

2    Nortriptyline instead, had anything to do with his increase urinary restriction difficulties.

3          42.          On May 20, 2020, the plaintiff learned from RN Joyce Faulstich that his March 18, 2016

4    diagnosis from from Dr. Hooman Melamed was missing from his medical records and she had asked the

5    plaintiff for a copy of Dr. Melamed's diagnosis so she could place a copy of it back in the plaintiff's medical

6    records. Plaintiff knew that Dr. Melamed's diagnosis was in his medical records during his visit with Dr.

7    Gulick on April 30, 2020, because plaintiff asked Dr. Gulick to find the copy of this report in his records and

8    read it. Dr. Gulick did so, but this greatly angered him, so this made plaintiff believe that Dr. Gulick removed

9    Mr. Melamed's diagnosis from the plaintiff medical records because Dr. Gulick did not want to provide Dr.

10   Melamed's recommended medical treatment for the plaintiff. Plaintiff filed grievance #TRCI-2020-05-144

11   over this issue. The final appeal response was on February 1, 2021, in which Assistant Medical Director stated;

12   "Dr. Melamed did not state that surgery is necessary and is not considered the absolute solution. There is no

13   conspiracy to hide your records." If an objective person reads Dr. Melamed's 3/18/16 diagnosis, he make it

14   abundantly clear that the back surgery he recommended was absolutely necessary in order to relieve the

15   plaintiff's pain symptoms.

16         43.          On May 28, 2020, the plaintiff had a visit with Dr. Gulick. Dr. Gulick said, "Dr. Roberts took

17   your pain medications away, because there was no medical diagnosis in your medical file that supported a

18   medical need for pain medications, because all that was wrong with you back was minor arthritis. The plaintiff

19   said, "Dr. Melamed's 3/18/16 diagnosis shows that I have no left side disc space and complete loss of

20   foraminal height at L4 to S1 in the lower spine, and this diagnosis shows exactly why the plaintiff has pinched

21   nerves in his lower back. Dr. Gulick became angry, and said, "the ODOC does not give a damn about a

22   diagnosis from a scoliosis expert. The ODOC does not owe you a scoliosis surgery. We don't have to provide

23   you with a scoliosis correction surgery because it is experimental and we do not have to do experimental

24   surgeries. The only surgeries we have to provide, is to save a nerve, but you do not have any nerves that need

25   saved because you are not completely numb anywhere yet. On June 10, 2020, the plaintiff filed grievance

26   #TRCI-2020-06-069. Plaintiff received a grievance response on July 1, 2020, by Nurse Manager Cindy Dieter

27   who stated; There is no documentation in your medical file to support your allegations. Dr. Roberts responded

28   to the grievance appeal on October 5, 2020, and Stated;"I find no evidence to support allegations of

29   abuse,neglect, unethical behavior or conspiracy against you." Plaintiff received the final appeal response from

30   Assist Medical Director J. Bugher on February 8, 2021, and stated; "Dr. Gulick bases his assessments, as does

31   every Medical Professional, on well established Medical Standard and Practices and many years of

32   experience."

33         44.          On June 10, 2020, the plaintiff received some medical records that he had placed a purchase

34   order for weeks earlier. One item was a lumbar X-ray report dated April 2, 2020. This X-ray report showed

1  that the plaintiff's spine was much worse than Dr. Gulick told him it was, when Dr. Gulick previously
2  examined plaintiff on April 30, 2020 and May 28, 2020 for the follow-up appointments to the April 2, 2020,
3  X-Rays. During both of these visits with Dr. Gulick, he would not let plaintiff read his own April 2, 2020 X-
4  Ray report. When plaintiff asked about his recent 4/2/20 back x-rays on 4/30/20 and 5/28/20, Dr. Gulick told
5  plaintiff that the x-ray report just says that he does not have any disc space left in your lower spine anymore.
6  Dr. Gulick did not tell plaintiff the X-Ray report showed that he had a broken pedicle screw at L3-4. Plaintiff
7  needed this critical information to protect his health and safety, because a Janaury 28, 2014 lumbar CT scan
8  showed that there was no evidence of any boney fusion at L3-L4 and non-union was suspected. The 4/2/20
9  back x-ray report shows that the TLOC committee should of repaired the plaintiff's non-union at L3-L4 before
10  the pedicle screw broke, because a broken pedicle screw will only complicate a future back surgery. The
11  plaintiff believes that Dr. Gulick deliberately hid this broken pedicle screw from him because it shows a cause
12  for some of his back pain and demonstrates a need for a back surgery. Plaintiff filed Grievance #TRCI-2020-
13  06-117 over this issue. Through no fault of the plaintiff, the grievance coordinator refused to accept this
14  grievance because plaintiff already had four different grievances pending on other issues. Because this
15  grievance was denied because of a new strict ODOC grievance rule, it should be considered that the plaintiff
16  completed the grievance process on this issue.

17      45.    On July 31, 2020, Plaintiff had an appointment with Dr. Gulick. Dr. Gulick told the plaintiff
18  that the ODOC was under no legal duty to treat his leg cramps, and back and neck muscle spasms, and "There
19  is nothing wrong with your back except some minor arthritis. There is absolutely no medical evidence that
20  explains why you can not walk or why you are having all this extreme nerve pain in your lower extremities
21  that you claim you have." Dr. Gulick claimed that Baclofen loses its effectiveness after taking it for more than
22  a couple weeks and then it stops working after 10 days of use. Then the plaintiff's baclofen was suddenly
23  discontinued again without any warning, which caused him to experience baclofen withdrawal effects again,
24  with increased pain, muscle spasms and insomnia, all because Dr. Gulick and the TLOC committee choosed to
25  ignore the precautions listed in the drug information on baclofen. It appears that Dr. Gulick wanted the plaintiff
26  to experience these baclofen withdrawal effects again, even though the plaintiff made it know to Health
27  Services and Dr. Gulick that the withdrawal effects for baclofen is a real issue.

28      46.    The plaintiff told Dr. Gulick that he had recently purchased some of his ODOC medical reports
29  and recently read his 4/2/20 lumbar spine X-Ray report. Dr. Gulick claimed that he had no memory of seeing
30  his April 2, 2020 lumbar x-ray report that indicated the plaintiff had a broken pedicle screw at L3-4 in his low
31  back. Dr. Gulick had to ask Nurse Practitioner Maney for confirmation on the broken pedicle screw.

32      47.    On August 4, 2020, the TLOC committee at Dr. Gulick's recommendation, drastically altered
33  the plaintiff's neurontin nerve pain medication schedule. The TLOC committee decided to taper off the
34  plaintiff's neurontin over the course of weeks. The TLOC committee decided to discontinue the Baclofen again

1  because they claimed it was not medically indicated for leg cramps. The plaintiff had not indicated he needed
2  it for leg cramps, he stated that he needed baclofen for the muscle spasms that he has in his back and neck. The
3  plaintiff had an appointment with Dr. Gulick, who insisted that he wanted the plaintiff to try 75 mg of
4  Nortriptyline daily for his pain and nerve pain in his lower extremities. The plaintiff stated that he had
5  experienced urinary restriction on similar levels of tricyclic drugs in the past. Dr. Gulick said that a pain
6  specialist would not see him unless he was already taking 75 mg of Nortriptyline and if he ever wanted to see a
7  pain specialist, then he needed to try taking the Nortriptyline for his pain. At Dr. Gulick's insistence, the
8  plaintiff agreed to take 50 mg daily of Nortriptyline. Even at this reduced dosage, this caused the plaintiff
9  urinary restriction for four straight days and the plaintiff stopped taking it. It took one month for the plaintiff to
10 get his prescription changed back to 25 mg of Elavil, during which time he had experienced sleeping difficulty.
11        48.        On August 6, 2020, the plaintiff filed grievance TRCI-2020-08-018, that detailed the reasons
12 for his pain, why the pain was so severe that it made his participation in the suggested physical therapy
13 impossible. On September 4, 2020, the plaintiff received the first grievance response from Nurse Manager RN
14 S. Johnston, who stated; After review of your medical file and your grievance, requesting to continue on the
15 pain medications you have been on for years, it shows that the TLC comprised of eight different providers and
16 one pharmacist have all agreed that these pain medications will not be renewed. They discussed your case in
17 March, May, June and August. On 9/3/2020, Dr. Gulick responded to your kytes requesting pain meds for
18 increased leg, feet and groin pain. The kyte response stated that the TLC will continue to offer you non-
19 narcotic chronic pain management medication and you are already scheduled for physical therapy. On
20 November 12, 2020, the plaintiff received the first appeal response to this grievance from Dr. Warren Roberts,
21 who stated; "DOC providers are mandated by Governmental and Pharmaceutical regulations and guidelines,
22 which require discontinuance of certain types of medications after short term use. Your medications referred to
23 in this grievance are not meant for long term or "chronic pain" use and have come under stricter controls and
24 limited use as previously noted. Documentation confirms you are aware of the reason for the discontinuance.
25 We will continue to offer you non-narcotic chronic pain management. Plaintiff received the final appeal
26 response on February 22, 2021, which is an exact copy of the response in the first level appeal response. The
27 responses to these grievance responses had incorrect information; the Baclofen, Gabapentin and Trammadol
28 pain medications in question, are not classified as Narcotics by the U.S. Drug Enforcement Agency. The TLC
29 committee just wants the plaintiff to take large amounts of Nsaid anti-inflammatory drugs because they know
30 these will give the plaintiff an ulcer and destroy his liver and kidneys and will eventually kill him, just like
31 they want.
32        49.        On October 6, 2020, the plaintiff filed grievance #TRCI-2020-10-037 because on September
33 26, 2020, the TLOC committee denied the plaintiff his request to self purchase medical care by an independent
34 outside medical provider, hand specialist Dr. Cathryn J. Vadala, MD, who had previously agreed to exam the

1   plaintiff's hand and wrist injuries. Plaintiff wanted to use the ODOC's self-purchase of Medical Rule under:

2   Oregon Administrative Rule 291-124-0085(1), which allows inmates to self-purchase outside medical care

3   from the community if inmates pay all expenses involved with the medical trip, so the plaintiff could get an

4   independent expert opinion by an actual "Hand Specialist" on suggested treatments and the level of disability

5   plaintiff is experiencing by the ODOC leaving these injuries untreated and the level of pain the plaintiff is

6   experiencing from living with these injuries untreated for the last 20 years, for his ongoing hand and wrist

7   injuries. The plaintiff needs an outside medical expert opinion in order to prove deliberate indifference so he

8   can compel the ODOC to provide him with the medical care that he needs to fix these injuries because the

9   ODOC has continuously denied the plaintiff adequate medical care for these injuries for the last 20 years, plus.

10   The ODOC is aware of this, and that is why they are denying the plaintiff's request to get this outside medical

11   expert opinion. It took 20 years for the plaintiff to find a hand specialist in his local area who would agree to

12   examine his injuries on a self-pay basis. The ODOC has used this fact to their advantage to avoid legal

13   consequences for deliberately denying the plaintiff adequate medical care for these injuries for over 20 years.

14   The fox is guarding the Hen House inside the ODOC. This is a criminal conspiracy by the defendants. When

15   the Covid-19 virus showed up, the ODOC canceled this doctors exam which had been previously approved by

16   the TLOC committee on November 3, 2019, before the pandemic. The TLOC stated they denied the plaintiff's

17   request for the self-pay option because they wanted the plaintiff to see their doctor at "Hope Orthopedics," in

18   the valley for an examination for his injuries when the pandemic was over with and due to covid throughout

19   the State, it may take some time for transfer. The final grievance appeal response was on April, 22, 2021, by

20   Assistant director J. Bugher which stated; "After a thorough review, I find that your medical concerns are

21   being addressed and treated as medically necessary. As Dr. Roberts advised, "Hope Orthopedics" has been

22   determined to be your best option and outcome to evaluate/treat your medical condition. The idea of a self-

23   purchase of medical care is to allow for an independent expert opinion. The prior ODOC prison doctor medical

24   opinions have been extremely bias, that is why the plaintiff needs the independent diagnosis and that is why

25   the ODOC is taking advantage of this Covid protocols, to stop the plaintiff from getting this independent

26   expert medical opinion.

27       50.   On October 19, 2020, the plaintiff met with Dr. Warren Roberts. The plaintiff informed Dr. Roberts

28   that he was having a lot of pain and muscle spasms in his back and neck, as well as severe nerve pain in his

29   groin area and legs. Dr. Roberts said that he saw the plaintiff's April 2, 2020 X-ray report that showed that he

30   had a fractured pedicle screw at L3-4. Dr. Roberts stated that he wanted to do some tests to see if the L3-L4

31   fusion was really broken, including a lumbar CT scan followed by an MRI and a nerve conduction study. Dr.

32   Roberts said that he would see the plaintiff again only after these tests had been completed. The plaintiff asked

33   Dr. Roberts if he could renew his pain medications that Dr. Gulick and the TLOC committee took away from

34   him. Dr. Roberts told the plaintiff that he would not prescribe him or any other inmates with any medications.

51.     Dr. Roberts told plaintiff that he never did it before and he was not going to start now, that he would not prescribe the plaintiff with any pain medications. Dr. Roberts said that it was the duty of his primary medical provider at TRCI to prescribe him with any pain medications that he needs and to then go through the TLOC committee to get their approval for the pain medications that the primary provider recommended. The plaintiff told Dr. Roberts that he had been told by other prison doctors including N.P. Maney, N.P. Gruenwald and Dr. Gulick, that (Dr. Roberts) was his primary medical provider and plaintiff had to go through Dr. Roberts from now on in order to get the pain medications that he needs. Dr. Roberts said, "that was not true, I had nothing to do with your nerve pain medications being discontinued. It looks like the TLOC had reviewed your pain medication needs recently and had decided against you." Dr. Roberts told the plaintiff that he had to go through his primary provider to get the pain medications he needs. The plaintiff asked who was his primary medical provider then because he did not know, because everyone had told him that Dr. Roberts was his medical provider. Dr. Roberts told the plaintiff that he believed that N.P. Maney was his primary provider.

52.     On October 29, 2020, the plaintiff had a 1;30 p.m. Appointment with Dr. Gulick over his continuing complaints of severe pain. The plaintiff told Dr. Gulick that he wanted to know the results from his last scoliosis Xrays on 10/21/20. Dr, Gulick said, "the X-Rays show a 32 degree thoracic curve and a 42 degree lumbar curve. Most surgeons would consider doing surgery after the curve reaches 30 degrees. Dr. Gulick noted that the plaintiff's 2015 scoliosis Xrays showed that both his curves were 30 degrees each at that time. Dr. Gulick asked about the plaintiff's nerve pain in his lower extremities. He said, "Is your nerve pain in your legs more like a burning nerve pain?" Plaintiff responded, Yes. It appeared as if Dr. Gulick was delighted to hear this news. Then Dr. Gulick said, "your nerve pain might not even be coming from your back. You might have developed femoral nerve disease in your legs. This happens when the nerve gets pinched at the hip joint and it is caused from being heavy and sitting up all day. I really think you have femoral nerve disease. I don't think your nerve pain is coming from your back at all." The plaintiff told Dr. Gulick that there is overwhelming evidence that the pain is coming from his back and he needs his pain medications restored and his neurontin back. The plaintiff told Dr. Gulick that he seen Dr. Roberts recently and he said that he does not prescribe medications to any inmates, so it appears that you had him waiting to see Dr. Roberts to get adequate pain medications for nothing. Dr. Gulick told the plaintiff that the Oregon Health Authority had recently reclassified Ultram and Neurontin as narcotics which prevented him from prescribing these drugs for chronic pain any longer or he risked losing his license and now the ODOC pharmacist had complete oversight of which medications that he could prescribe to inmates. Dr. Gulick first tried to convinced the plaintiff to try a drug called Tegratol, telling him it is just as good as neurontin. The plaintiff said that he was told by prior doctors that tegratol was dangerous and had a reputation of causing heart failure. Then Dr. Gulick told plaintiff that he should try a drug called Trileptal, for the treatment of his nerve pain and this would replace the pain medications, Ultram, Neurontin and Baclofen which were taken away from him.

1       53.      Dr. Gulick said, "Trileptal is just as good as Neurontin at treating nerve pain." The plaintiff

2  later found out that Trileptal was a dangerous anti-epileptic drug that was designed to control seizures and has

3  never been recommended for the treatment of nerve pain before. Dr. Gulick was using the plaintiff for

4  experimental purposes by prescribing him an unproven drug for nerve pain. Dr. Gulick also prescribed the

5  plaintiff a Nsaid anti-inflammatory drug called Celebrex, to take the place of the indomethacin that Dr. Gulick

6  and the TLOC committee had also taken away from him recently.

7       54.      On November 13, 2020, Plaintiff had a lumbar CT scan. The scan showed at L4-L5 that there

8  was a diffuse disc bulge and [ligamentum flavum laxity] which had progressed since the prior CT scan from

9  2014 with marked narrowing of the central spinal canal.

10      55.      On December 10 and December 29, 2020, the plaintiff again submitted a healthcare requests

11  stating that the pain medication that was prescribed to him was not adequate to control his severe nerve pain in

12  his lower extremities and his muscle spasms in his back and neck and the Trileptal that he was prescribed was

13  not helping his pain. The plaintiff requested that he be prescribed Ultram, Neurontin and Baclofen for his

14  severe nerve pain and muscle spasms again.

15      56.      February 4, 2021, the plaintiff seen Dr, Gulick. This was the first time that he was seen by a

16  ODOC medical provider since he had the lumbar CT scan on 11/13/20. The plaintiff asked about the results of

17  his lumbar CT scan. Dr. Gulick looked through his file and found the 11/13/20 lumbar CT scan and then read

18  the findings. Then Dr. Gulick told the plaintiff at this meeting, "You have got a really bad back. This CT scan

19  report shows that your back has become worse since your last CT scan and no wonder you are complaining

20  about having a lot of back pain and severe nerve pain in your lower extremities all the time!" Then Dr. Gulick

21  prescribed Ultram once a day at night for 3 months. Dr. Gulick told the plaintiff that he was prescribing him

22  the Ultram so he could get better sleep because he knew that his back and leg pain must be keeping him awake

23  at night. Dr. Gulick stated everyone deserved at least a decent nights' sleep. Dr. Gulick also prescribed the

24  plaintiff the seizure drug Kepra, for his severe nerve pain in his lower extremities. Dr. Gulick told the plaintiff

25  that all seizure drugs can be used to treat nerve pain just like the seizure medication Neurontin is used to treat

26  nerve pain. The plaintiff told Dr. Gulick that he tried the seizure drug Trileptal and it had no effect on his nerve

27  pain what so ever and he believed that the Trileptal and Crestor medication were actually making his nerve

28  pain and muscle spasms worse. Dr. Gulick told the plaintiff that it was Dr. Roberts idea to take him off all his

29  pain medications and Dr. Roberts is his boss and he has to do what his boss tells him to do. On October 19,

30  2020, Dr. Roberts told him that it was his general practice not to get involved with prescribing pain

31  medications to inmates. Since the plaintiff has not seen Dr, Robert since 10/19/20, he has been unable to ask

32  Dr. Roberts about Dr. Gulick's recent statement to him about who really took his pain medications away from

33  him.

34

57.      On March 4, 2021, the plaintiff submitted a healthcare request form indicating that he had taken the Kepra for three weeks and it has done nothing to reduce his severe nerve pain at all. The plaintiff stated that he had experienced nightmares often since taking the Kepra and he felt this was related, so the plaintiff stopped taking the Kepra. The plaintiff continued taking the Ultram at night as directed and was told by a nurse in the medication line that he would not have to do anything to renew his Ultram prescription before it expired. On March 27, 2021, the plaintiff submitted a healthcare request to see a spinal specialist and to consider renewing his prescription for Neurontin.

58.      On April 7, 2021, the plaintiff had a meeting with Dr. Gulick, in which he told Dr. Gulick about his need for adequate pain medication for his severe nerve pain again. Dr. Gulick abruptly changed the topic of the conversation and asked the plaintiff, "How much prison time do you have left on your prison sentence anyway?" Then Dr. Gulick answered his own question out loud, saying; "OH, it says right here, you are going to be with us for a very long time." Indicating that he was denying the plaintiff pain medication because of his long prison sentence and not based on valid medical concerns. This time Dr. Gulick told the plaintiff that his back condition was "just some minor arthritis" and he told the plaintiff, "I have nothing left in my toolbox to give you for your pain. I am not allowed to give you narcotics for chronic pain anymore." The plaintiff told Dr. Gulick that Ultram, Neurontin and Baclofen are not narcotics, so this should not be an issue. Dr. Gulick said that the Oregon Health Authority said that they were narcotics and I have to go by what they tell me or I will lose my license. Dr. Gulick told the plaintiff that he would need to "talk to Mr. Maney if you want pain medication, because Mr. Maney is your primary medical provider. Mr. Maney will have to prescribe you pain medications from now on because I just won't do it." The plaintiff does not have any control what so ever as to which medical provider he is allowed to see when TRCI Health Services schedules his doctor's exams. Up until this time period, the plaintiff was routinely scheduled to see Dr. Gulick, not Mr. Maney. The plaintiff was told by nursing staff that Dr. Gulick was his primary physician in charge of prescribing him medication. The plaintiff has not seen Mr. Maney on an individual basis since April 2020 after his 4/2/20 lumbar X-rays that Mr. Maney ordered. Mr. Maney refuses to meet with the plaintiff and he told the plaintiff in writing to write him about his medical issues. But when the plaintiff writes Mr. Maney, someone else from medical services responds to the plaintiff's medical requests, to prevent Mr. Maney from receiving his messages. No true form of communication exist between the plaintiff and Mr. Maney, but yet Mr. Maney is written all of the plaintiff's medication prescriptions since April 7, 2021 and Mr. Maney took it upon himself to do the pain specialist consult on the plaintiff's behalf without ever discussing with the plaintiff his pain symptoms or his medical issues. Mr. Maney denied the plaintiff the right to participate in his own pain consult. Mr. Maney has never examined the plaintiff, nor has he ever shown any willingness to do so. The plaintiff believes that Mr. Maney is trying to run some kind of cover up for Dr. Gulick and they are conspiring together with Dr. Roberts to deny the plaintiff adequate pain medications for his serious medical conditions because

1   they wish to impose physical torture upon the plaintiff by depriving him of adequate pain medications. These

2   prison doctor's action are just old fashion abuse and physical torture by power hungry prison doctors who think

3   they are above the law and can do what ever they want to the inmates because there is no one within the

4   (ODOC) that will punish them for this abuse because the only way they could be stopped is if another outside

5   independent medical physician examines the plaintiff and they plan to do everything in their power to stop that

6   from happening.

7        59.     On April 19, 2021, the plaintiff filed grievance #TRCI-2021-04-056 against Dr. Gulick and

8   NP Bono because Dr. Gulick had insinuated in Bono's presence to the plaintiff that he was denying him

9   adequate pain medications because of the length of his prison sentence and not because of a legitimate medical

10  need. Dr. Gulick's statement really demonstrated why he is so bias against the plaintiff and wanting to hurt the

11  plaintiff by denying him adequate medical care and pain medication. The plaintiff received a grievance

12  response on May 14, 2021, which just said, "he was not allowed to choose his his own provider and he has the

13  right to decline medical appointments if he chooses." The plaintiff received his final appeal response on

14  August 18, 2021, by Dr. Roberts who stated: "For someone of your medical diagnosis, Mr. Maney would be

15  your primary here at TRCI, but he would rely heavily on the recommendations from other ODOC providers

16  for other medical issues." None of the grievances responses the plaintiff received address the issue put forth in

17  this grievance.

18      60.     On May 6, 2021, the plaintiff found out that his Ultram-Trammadol prescription had not

19  been renewed and he was not provided with a reason for this from TRCI Health Services. On May 13, 2021,

20  the plaintiff submitted a healthcare request to be seen about the severe nerve pain he was having in his neck,

21  back, legs and groin area. The plaintiff was told to discuss this with his primary provider at his next doctor's

22  visit. The plaintiff was not provided with a time line as to when his next medical provider appointment would

23  be. The plaintiff submitted further healthcare requests on May 18, 2021, and May 25, 2021, asking who his

24  primary provider is, if not Dr. Gulick.

25      61.     On May 13, 2021, the plaintiff filed grievance #TRCI-2021-05-035 against the TLOC

26  committee for refusing to his Ultram prescription that Dr. Gulick started again on February 4, 2021, in light of

27  the plaintiff's new November 13, 2020 lumbar CT scan which showed that the plaintiff's spine had been getting

28  much worse and not better. Even Dr. Gulick admitted this much after he read the plaintiff's new lumbar CT

29  scan report. This CT scan report clearly shows the cause for the plaintiff's severe nerve pain in his lower

30  extremities. The plaintiff received a grievance response on July 15, 2021 by Dr. Roberts, which states: "Your

31  request for trammadol was reviewed by TLC on 4/20/21. It was decided to taper your trammadol (AKA;

32  Ultram) and increase your Elavil. You have an upcoming appointment with the provider to further discuss pain

33  control issues. I concur with the decision you received from the TLC committee. This response is final and no

34  further response or appeal will be provided." The prison doctors knew that the plaintiff can not take high doses

1  of tricyclic drugs, he has went over this with them just recently, but yet they are still trying to force large doses

2  upon the plaintiff, even though tricyclic drugs do not treat his nerve pain and cause him urinary restriction

3  issues. This shows that there is no end to the TLOC committees cruelty when it comes to adequate medical

4  treatment inside the ODOC.

5         62.       On May 25, 2021. the plaintiff appealed grievance #TRCI-2021-04-056. He wrote that his

6  grievance was not about being denied the right to choose his own medical provider, but rather he wished to be

7  informed about who his primary medical provider was, so he could speak to them about his need to receive

8  adequate pain management medication for his severe back and neck pain and severe nerve pain in his lower

9  extremities. To that point, the plaintiff was routinely scheduled to see Dr. Gulick, but Dr. Gulick stated that he

10  was not able to discuss pain management medication with the plaintiff, because he was not the plaintiff's

11  primary medical provider.

12         63.       On May 26, 2021, the plaintiff received a response which stated, "N.P. Maney is the only main

13  medical provider at TRCI, but we have traveling providers – you are [sic] scheduled to see provider Dr. Keith

14  White." The plaintiff did not see Dr. White until June 10, 2021, and was told by Dr. Keith White, "Dr. Roberts

15  told me that he will not let me prescribe Neurontin to the inmates anymore. I am not allowed to prescribe

16  trammadol either, because it is just a synthetic narcotic like morphine and we are not allowed to prescribe

17  narcotics either, except in cases where someone is in pain and is dying of cancer... You are just going to have

18  to live with your pain. Your back is not that bad anyway." Dr. Keith White further told plaintiff "disc bulges

19  have a way of resolving themselves over time" and "I do not see anything wrong with your back except some

20  mild arthritis and I don't see anything wrong with your back that would not get better by itself over time. There

21  is nothing in your 11/13/20 lumbar CT scan that indicates any nerve impingements in your spine. Your CT

22  scan indicates no need for back surgery. Your scoliosis is not bad. " Then Dr. White said, "the real reason why

23  I was hired to come to work here was because someone asked me to do a hit job on an inmate for them." Dr.

24  White also discussed with the plaintiff the risks involved with long-term use of Celebrex for Arthritis and that

25  he should not use it any longer than a couple months. Plaintiff expressed his desire to remain on Celebrex for

26  now, as he had not been taking it for very long at that point, and Celebrex did help him some with the soreness

27  in his lower back and even though Celebrex was doing nothing to relieve his severe nerve pain, it was better

28  than nothing, so he would rather continue taking it. The next day at medication line, the plaintiff learned that

29  Dr. White had discontinued the Celebrex and that Dr. White documented in the plaintiff's medical chart that

30  that he discontinued the Celebrex because the plaintiff told him that it was not helping his pain. The plaintiff

31  never told that to Dr. White.

32         64.       On June 17, 2021, the plaintiff filed grievance #TRCI-2021-06-066 against Dr. Keith White

33  for what he told the plaintiff on June 10, 2021. The plaintiff said this serious issue needs to be investigated and

34  he needs to be seen by a doctor who is honest and understands his serious spinal condition and who was not

1   specifically hired to do a "Hit Job" on some inmates. My condition requires nerve pain medication. (Plaintiff

2   knows that the "Hit Job" was meant for him. There is no other reason Dr. White would tell the plaintiff that he

3   was hired to hurt an inmate, unless that inmate was the plaintiff. The plaintiff believes that Dr. White was hired

4   to him his in retaliation for the grievances he filed against Dr. Gulick for the way he treated the plaintiff. The

5   plaintiff received a grievance response on October 11, 2021, by Dr. Roberts. Dr. Roberts stated; The (TLC)

6   committee is a review committee comprised of the Health Services Chief of Medicine and one or more

7   department providers to review care and treatment request on a case-by-case basis. On 6/22/2021, your request

8   for Neurontin was taken to the TLC committee. They did not approve it at this time. You have been approved

9   for bilateral lower extremity nerve conduction and velocity and a chronic pain specialist consult. I concur with

10  the decision you received from the TLC. This response is final and no further response or appeal will be

11  provided." Again, the plaintiff is provided with a grievance response that does not address the issue that was

12  raised in the grievance.

13      65.     On July 28, 2021, the plaintiff had spinal scoliosis X-rays taken at TRCI. The findings section

14  of the report states: "It was taken in a wheelchair due to the patient's inability to stand. The lack of an upright

15  weight bearing view significantly compromises assessment and should not be relied upon for clinical decision

16  making." The plaintiff, however, did stand for the duration needed to take each back X-ray. If the technician

17  cannot accurately record a basic detail as to whether the patient was sitting or standing for the X-rays, the

18  value of the procedure is limited. The plaintiff repeatedly complained to the TRCI Health Services Manager

19  Ms. Cindy Dieter, RN, over the incorrect findings in his July 28, 2021 X-ray report. RN Dieter would not

20  admit that her X-ray technician made an error, but they did agree to repeat these back X-rays to resolve the

21  conflict. The repeat scoliosis X-rays were completed on October 21, 2021. The X-ray report show that the

22  plaintiff's bottom curve is now 47.7 degrees and his upper curve is 32.6 degrees. These Xrays were just

23  scoliosis X-Rays. The scoliosis Xrays reports contain limited information that documents the degrees of the

24  spinal curvatures of the plaintiff's spine. The plaintiff needs lumbar X-rays to determine whether the condition

25  of the previously noted broken pedicle screw has further deteriorated and the degree of movement in the

26  broken fusion at L3-L4 to caused the pedicle screw to break in the first place.

27      66.     On February 4, 2021, while the plaintiff was seeing Dr. Gulick for his back and leg pain, he

28  asked Dr. Gulick for the results of his last blood test on January 16, 2021. Dr. Gulick told the plaintiff that his

29  lab report showed that his red blood cell count was low and each of his blood test results over the last several

30  years shows that plaintiff has had low red blood cell counts and he believed the plaintiff was losing blood

31  somewhere internally and had become anemic. Dr. Gulick said that he wanted to do some additional blood

32  tests to confirm his findings. A blood test was completed on February 9, 2021. This lab report confirmed that

33  plaintiff is seriously anemic. The report offered no clue as for the reason of the anemia. At that time,

34  Dr. Gulick prescribed the plaintiff Ferrous Sulfate 324 mg Tabs twice daily. The plaintiff could not take these

1  iron pills twice daily as they caused him severe constipation but he took one pill each day.

2      67.      On April 7, 2021, the plaintiff had a meeting with Dr. Gulick and he asked the plaintiff if he

3  was taking his iron pills. Dr. Gulick told the plaintiff that his April 12, 2021 lab report showed that he was still

4  anemic but his body had a lot of small red blood cells which indicated that his body was making new red blood

5  cells but just could not keep up with demand because he was losing too much blood somewhere. Linda Bono,

6  N.P. Was in the room also to observe this meeting. The plaintiff told Dr. Gulick that he would get really

7  constipated when he took the iron pills twice a day for several days and so he had to reduce his intake to one

8  pill a day. N.P. Linda Bono spoke up and said iron pills can do that to a person and taking ferrous sulfate twice

9  daily is way too much iron in one day and that much iron is toxic to the body and could be harmful and that the

10  plaintiff was correct to limit iron intake to once a day. Dr. Gulick agreed to change the ferrous sulfate

11  prescription to Ferrous Gluconate, 240 mg tab once daily, Dr. Gulick said this would be easier on the plaintiff's

12  guts. Dr. Gulick ordered another blood test and a Colonoscopy in his attempt to find the plaintiff's blood loss.

13  The blood test was done on April 12, 2021, and this showed that the plaintiff was still seriously anemic and

14  low on iron.

15      68.      On May 28, 2021, the plaintiff had a blood test and the results showed he was still anemic. The

16  plaintiff had a Colonoscopy on April 28, 2021, and the results showed a normal colon, the cause of the blood

17  loss was not found. Then Dr. Derek Earl, MD, ordered an Esophagogastroduodenoscopy (EGD) procedure for

18  the plaintiff, to look into his stomach to search for the cause of the blood loss. On May 12, 2021, the plaintiff

19  received a kyte from NP Maney which stated; "TLC recommends (EGD) for long term acid reflux. Scheduling

20  in process." The (EGD) procedure was done on June 23, 2021. Dr. Earl could not complete this (EGD)

21  procedure because there was food still in the plaintiff's stomach, so Dr. Earl could not see the bottom part of

22  the plaintiff's stomach or his small intestines. Dr. Earl told plaintiff that he needed to repeat the (EGD)

23  procedure, but next time, he wanted the plaintiff to be completely flushed out, like he had done before the

24  colonoscopy. Later, the plaintiff learned that Dr. Earl had changed his plan to treat the plaintiff's anemia, in a

25  kyte by NP Maney, who told him that Dr. Earl wanted the plaintiff to have an abdominal Ultra-sound and a

26  Gastric Emptying study first before they repeated the (EGD) procedure.

27      69.      On June 24, 2021, the plaintiff received a communications form, (AKA a Kyte) from

28  NP Maney which stated; Review of (EGD) report recommends ultra-sound, possible Gastroparesis complicates

29  GI issues, maybe related to diabetes, more later after ultra-sound. On June 28, 2021, the plaintiff received

30  another kyte from NP Maney which stated; "Reviewed (EGD) report,- Gastritis and Esophagitis without

31  bleeding, Gastroparesis. Will follow-up with recommendations for Gastroparesis next week, more after TLC

32  6/29. Avoid excessive use of Nsaids (IBP, Naproxen, etc...) All can cause Gastritis." The (EGD) procedure has

33  not been repeated and the source of the plaintiff's anemia is still a mystery.

34

70.     On July 14, 2021, the plaintiff had an abdomen Ultra-sound. The results showed that plaintiff had, 1; a suboptimally distended gall bladder with large gall stones, 2; Unchanged large dense liver, 3; Pancreas, common duct and right kidney suboptimally seen. The plaintiff was provided with a visit with Dr. Maccabee, a surgeon from Good Shepherd hospital in Hermiston Oregon, and his assessment was that the plaintiff's gall bladder needed to be removed. Dr. Maccabee told plaintiff that his anemia issues were not related to his large Gall Stones diagnosis. On August 8, 2021, the plaintiff sent in a healthcare request for a doctors appointment to discuss his severe acid reflux, gall stones and his anemia issues. On August 9, 2021, the plaintiff received a response which stated; "You should have a chart review next week. On August 10, 2021, the plaintiff sent a kyte to the Health Services Manager RN Cindy Dieter stating; "That he had previously read the ODOC Health Care Referral Outside Agency forms upon his return to TRCI after the 7/14/21 (EGD) procedure, and those forms he read at that time said, that Dr. Earl wrote he needed to repeat the (EGD) procedure to inspect the patient's small intestines." The plaintiff was trying to point out that he was aware that someone had altered those forms since he came back from the (EGD) procedure, and Dr. Earl's orders had been changed to a Gastric Emptying Study instead of the original order to repeat the (EGD) procedure. The plaintiff stated, "He is obviously bleeding internally somewhere and he asked if his anemia will be covered up until he is dead." RN Scott responded and stated; "I have scheduled you tomorrow for sick call." On August 31, 2021, the plaintiff sent in a healthcare request asking if he had been scheduled for gall bladder surgery yet. On September 2, 2021, RN S. Johnston replied stating; "At this time, we are only scheduling urgent/emergent."

71.     On September 11, 2021, the plaintiff wrote a kyte to RN Dieter which stated; "I would like to know when is a medical condition classified as urgent/emergent to where medical care has to be provided to an inmate? Do I have to wait until my Gall Bladder burst and I am dying from severe infection before the (ODOC) will provide me with the Medical Care I need?" On September 13, 2021 RN Dieter responded stating; "We are seeing urgent/emergent, which is classified as, heart attack, stroke type issues for example. Obviously an acute Gall Bladder attack would be a medical emergency, however Gall bladder disease waiting for elective surgery would have to wait."

72.     On September 12, 2021, the plaintiff sent in a healthcare request stating; "He is having a lot of pain constantly on his right side and it's getting worse and he thinks it's his gall bladder and he thinks it's getting ready to burst, based on the pain he is having." On September 13, 2021, plaintiff received a reply that stated; "You're scheduled to see the nurse at sick call." On September 14, 2021, plaintiff sent another kyte to RN Dieter that stated, "Please tell me what you would classify as an Acute Gall Bladder attack? Does my Gall bladder have to burst before it is considered an acute gall bladder attack or when I am doubled over in severe pain, would that be an acute attack? If doubling over in pain is considered an acute attack, then I have reached that level a few times already. I am in pain now. I need to know how to deal with this medical condition

1   because it's getting worse." On September 15, 2021, RN Dieter responded stating; "We are going to consider
2   your case as an urgent need due to your ongoing symptoms. We will schedule your priority surgery." On
3   September 21, 2021, plaintiff had the surgery and very large Gall stones were removed." The plaintiff never
4   received a follow-up visit after this surgery. Currently, it appears as if NP. Maney has stopped trying to find the
5   source of the plaintiff's anemia. Plaintiff is currently taking iron pills for his anemia.

6       73.   On August 3, 2021, N.P. Mr. Maney,  had a pain specialist teleconference consult on the plaintiff's
7   behalf with Dr. Joseph Walker III, P.hd., who practices medicine from his office in Farmington, Connecticut;
8   called U-Conn Muscular-Skeletal Institution. Plaintiff was not allowed to participate in this consult, so he has
9   little information as to what NP. Maney told Dr. Walker about his pain symptoms other than the notes that
10  NP. Maney wrote in his medical records on August 3, 2021. The progress notes from this August 3rd pain
11  consult stated: 58 y.o. Has a diagnosis of chronic pain due to scoliosis and multiple lumbar surgeries including
12  L3-4 fusion. The patient's current function is: wheelchair for distance with little to no walking. He has not had
13  any functional changes with limited to no improvement. The treatments (services) tried included physical
14  therapy and behavioral health services. The consult today is for the development of ongoing pain management
15  plan for patient. Treatment goals are 1) medication review and assistance, 2) discuss about ways to improve
16  function, 3) patient education strategies and 4) Create and enact a plan for improved function. Medications
17  tried (previous/current) includes: Etodalac, Trammadol-Ultram, Gabapentin, Baclofen, Indocin, Melatonin and
18  lidocaine ointment. Also specifically: Celebrex 200 mg twice daily and amitriptyline 10 to 25 mg Qday.

19      He has a past medical history of: Delusional disorder.

20      Objective: No physical examination was given, this was a provider to provider telehealth consultation.
21  Diagnostic Studies: 11/13/21, MRI Lumbar Spine. Impression: 1. There is a new diffuse disc bulge at L4-5
22  with superimposed right paracentral disc protrusion which obliterates the right lateral recess and narrows the
23  central canal. 2. Marked bony foraminal narrowing is noted at L4-5 and L5-S1. 3. Posterior Bony fusion from
24  thoracic spine to L3 with posterior fusion and intervertebral disc hardware noted at L3-4. Alignment is
25  unchanged. 10/21/2020, X-Ray Lumbar Spine, Scoliosis Series. Impression: Severe thoracic lumbar scoliosis,
26  concave left of 32 degrees in the thoracic spine and concave right in the lumbar spine of 42 degrees.

27      Labs: GFR 87; Hgb 12.4

28      Assessment/Plan: Chronic pain due to scoliosis and multiple lumbar surgeries, including L3-4 fusion.
29  Overall. I agree with current, ongoing care plan. Additional recommendations include the following: 1.
30  Medication Management: a. Diclofenac 75 mg twice daily, Indocin for break through. B. Can consider;
31  Sulindac 150 mg twice daily as well. 2. Functional Management: a) ADL goal setting, this will assist with
32  creating measurable functional goals for patient to strive for. (Pain Neuroscience Education) b) PT can be
33  reinstituted for the above diagnoses and impairment, signed Joseph Walker III, MD. This page is stamped with
34  NP. Maney's initials and stamp, with the date of 8/5/21.

74.     It should be NOTED that the plaintiff had a CT scan on 11/13/20 and not an MRI as stated in NP Maney's progress notes from the 8/3/21 pain consult. The plaintiff did not even know that this teleconference consult between NP Maney and Dr Walker had taken place until about a month after the fact, but plaintiff still had no details needed to understand what had taken place. The plaintiff had to order copies of his medical records in order to gain any insight into this pain consult. It took until September 27, 2021, before plaintiff received a copy of this consult. Plaintiff then learned from the 8/3/21 progress notes, that they contained many false representations and misleading statements about the plaintiff's spinal condition.

NP Maney failed to inform Dr. Walker about plaintiff's previous full spinal fusion with a Harrington Rod from T1 to L4 at age 15, because of severe scoliosis. NP Maney failed to inform Dr. Walker about plaintiff three additional spinal surgeries following the full spinal fusion, which were an attempt to refuse his broken fusion at L3-4, because the fusion failed repeatedly in the same location. NP Maney failed to inform Dr. Walker that during the second attempt to refuse the broken fusion at L3-4, the surgeon did a procedure called a reverse interbody fusion with ray cages. After this surgery the ray cage on the left managed to migrate 1 cm into his spinal canal crushing plaintiff's spinal cord making it mandatory for a third back surgery at OHSU in 2009, in which the neurosurgeons removed the protruding ray cage from his spinal canal and then placed pedicle screws on both sides of the vertebra at L3-4, nor did NP. Maney relay the fact to Dr. Walker that the plaintiff has not been able to walk since his 2009 back surgery because he ended up with severely pinched nerves on the left side of his lower spine that caused him a severe electric shock type nerve pain symptom when he transfers from his wheelchair or stood and placed weight on his left leg in an attempt to try to walk.

75.     NP Maney did not inform Dr. Walker during this 8/3/21 consult, that the plaintiff has been complaining continuously to the prison's Health Services Department about severely pinched nerves and nerve pain symptoms in his low back and legs since the 2009 surgery and the fact that the nerve pain in his lower extremities has increased and has become more severe since his 2009 surgery.

76.     NP Maney also failed to report to Dr. Walker that plaintiff had a 2013 MRI that documented retrolisthesis of L4 respect to L5. Disc bulging associated with intradiscal signal relating to annular tear or post-operative change that encroaches upon the interior aspect of the right neural foramen without evidence of anatomic impingement upon the exiting L4 nerve root. Mild to moderate bony compromise of the left neural foramen at L5-S1 and only a very short segment of the conus is visualized in this examination. The ODOC Health Service's did not forward the 2013 MRI to an orthopedic specialist to be studied, which would be the normal procedure for a patient that was not in prison.

77.     NP Maney failed to inform Dr. Walker that the plaintiff had a lumbar CT scan on January 28, 2014, that shows a vacuum disc present at L5-S1, and an interbody metallic fusion cage is present between L3-L4 on the right side and there is irregular lucency surrounding the upper margin of the cage and there is no evidence of bone union across L3-L4. The timing of the bone fusion surgery is not known, but nonunion is

Page - 26 of   47     CIVIL RIGHTS COMPLAINT   42 U.S.C. § 1983,   29 U.S.C.A § 794

1  suspected. Impression: Suspected non-union across L3-L4. (In Medical literature, a vacuum disc is a clear

2  indicator that a patient has a significant Retrolisthesis at that vertebral joint,

3  (see: http://en.wikipedia.org/wiki/Retrolisthesis).

4      78.    Even though NP Maney listed the plaintiff's November 13, 2020 Lumbar CT scan as an MRI

5  in his 8/3/21 Progress Notes, NP Maney only provided information to Dr. Walker as to what was stated in the

6  Impression part of the 11/13/20 CT scan report and it appears that NP Maney left out what is documented in

7  the findings part of this report. Most notably, the findings show Extensive streak artifact at L3-4 related to the

8  posterior hardware which renders the evaluation suboptimal. *(This is important since plaintiff had lumbar X-

9  Rays on April 2, 2020, which showed that the posterior hardware fusion at L3-L4 had a broken lower left

10  pedicle screw.) This creates the appearance that NP Maney was trying to hide this fact from Dr. Walker that

11  plaintiff has a broken lower left L4 pedicle screw, which could only be caused if plaintiff has a nonunion at

12  L3-L4. The broken pedicle screw in the April 2, 2020, lumbar X-Rays and with the January 28, 2014, lumbar

13  CT scan report showing there is no bony fusion at plaintiff's L3-L4, this proves that plaintiff has an unstable

14  broken fusion at L3-4, which has caused this pedicle screw to break. NP Maney hid this fact from Dr. Walker

15  because he really has no interest in properly treating the plaintiff's severe back and nerve pain in his lower

16  extremities. NP Maney did not let plaintiff participate in this teleconference pain consult with Dr. Walker

17  because NP Maney was really trying to hide the plaintiff true severe pain symptoms from Dr. Walker because

18  NP Maney set up this whole charade in the hope to use it as a legal cover so he could continue to not

19  adequately treat the plaintiff's severe pain, because NP Maney is so cruel that he actually enjoys making the

20  plaintiff suffer.

21      79.    The November 13, 2020, lumbar CT scan findings also documents the plaintiff has retrolisthesis

22  at L5-S1 and it shows the vacuum disc again, at L5-S1, showing it's still there, but now with endplate sclerosis

23  noted. The 11/13/20 lumbar CT scan findings also show a diffuse disc bulge and ligamentum flavum laxity at

24  L4-L5, which has progressed since the prior 2014 CT scan with "marked narrowing" of the central canal.

25  There appears to be a right paracentral disc protrusion which obliterates the right lateral recess. There is

26  marked bilateral bony foraminal narrowing. (Even with these serious injuries being documented, Dr. Gulick

27  and NP Maney strive to take plaintiff's pain medications away from him, and using Dr. Walker's lack of insight

28  into plaintiff's true physical condition as cover to physically torture the plaintiff and violate his U.S.

29  Constitutional Rights.) (Plaintiff's scoliosis condition is so complex and serious that NP Maney acted with

30  indifference to plaintiff's health and safety by using a doctor from the complete opposite side of the United

31  States from plaintiff's current location, to deliberately cause confusion and misinformation upon Dr. Walker

32  about plaintiff true severe pain symptoms, so NP Maney could have an excuse, so he could hide his bad acts

33  and in order to get away with not treating plaintiff's severe nerve pain properly. This is apparent, especially

34  since plaintiff was not allowed to provide an accurate description of his pain symptoms and medical history to

1    Dr. Walker, in order to make sure he had correct information about the plaintiff's pain symptoms and health
2    status, before Dr. Walker recommended those Nsaid pain drugs for the plaintiff. Adequately treating the
3    plaintiff's severe nerve pain is very important, because making sure the plaintiff has adequate pain medications
4    for his severe nerve pain resulting by his back condition, determines an outcome that can make a large
5    difference on the plaintiff's quality of life. Providing a pain medication that is inadequate to treat his pain,
6    ensures plaintiff will have a reduction in his quality of life.) The plaintiff has not been seen by Behavior Health
7    Services at the request of a medical provider to help him deal with his pain that the plaintiff knows about,
8    because no one mentioned this to him before.

9         80.        NP Maney also failed to inform Dr. Walker of Dr. Hooman Melamed's March 18, 2016,
10   diagnosis, which is currently in plaintiff's (ODOC) medical records. Dr. Melamed is a renowned scoliosis
11   specialist. The plaintiff obtained Dr. Melamed's diagnosis on a self-pay independent basis and was able to get
12   this diagnosis by making available to Dr. Melamed numerous diagnostic images (films) of the plaintiff's spine,
13   including MRI, CT scans, and X-Rays of his cervical, thoracic and lumbar spine. Dr. Melamed's findings were,
14   ["the patient still has significant scoliosis and it has likely worsened again after the removal of the
15   instrumentation from the patient's spine. Due to the patient's spinal curvature, he is fixed in a coronal
16   imbalance deviated to the right side. I disagree with the previous assessment that the patient suffers from flat
17   back syndrome. The patient's scoliosis is causing left sided lumbar disc space narrowing and the loss of
18   foraminal height in the lower thoracic spine and lumbar spine. At this time, the patient needs a very extensive
19   revision scoliosis correction surgery and this would be required in order to alleviate the patient's symptoms."]

20        81.        When Dr. Melamed made this diagnosis, the plaintiff's upper and lower scoliosis curves were
21   both 30 degrees each. In the plaintiff's scoliosis X-Rays dated October 21, 2021, the report states that his upper
22   curve is now 32.6 degrees and his lower curve is 47.7 degrees. These scoliosis X-Rays were taken after the
23   8/3/21 pain consult, but these X-Rays do show that the plaintiff's spine has become worse since Dr. Melamed
24   diagnosed him on 3/18/16.

25        82.        NP Maney failed to inform Dr. Walker about the plaintiff's severe cervical spine condition-
26   injuries. In 2014, the radiologist who wrote the report for the 2014 X-Rays, found that the plaintiff has a
27   reversed curvature in his neck and he believed that this was caused from a muscle spasms. This diagnosis was
28   the reason why Dr. Norton first prescribed the plaintiff with the muscle relaxer baclofen. The baclofen helped
29   with the neck muscle spasms some. The plaintiff's cervical spine has progressively gotten worse since 2014.
30   The plaintiff has constant pain in his neck that becomes so bad at times that it hurts just to hold up his head.
31   The plaintiff had additional cervical spine X-Rays and several MRI since 2014 that show that his neck
32   condition has become much worse. The plaintiff is being denied adequate medical care and pain medication
33   for his neck injuries also. A cervical spine MRI study on October 7, 2019, documents multilevel discogenic
34   degenerative changes and facet arthropathy and moderate central canal stenosis at C3-4 with moderate bony

1   compromise of the left neural foramen. This causes constant pain in the plaintiff's left arm and he even has
2   problems using his left arm at various times and severe neck pain and muscle spasms daily, especially since
3   the (T.L.O.C.) committee took the baclofen away from him. The plaintiff fears that he will end up losing the
4   use of his left arm if he doesn't receive medical care for this serious medical condition soon. The plaintiff
5   believes his cervical medical condition is more of an acute medical problem than a chronic one according to
6   the medical evidence, as it appears he will need neck surgery soon in order to prevent his neck condition from
7   getting worse.

8         83.   NP Maney never informed Dr. Walker about the plaintiff's June 23, 2021, (EGD) study results,
9   in which Dr. Derek Earl diagnosed his stomach and esophagus as having a medical diagnosis called, Gastritis,
10  Esophagitis and Gastroparesis, which are serious medical conditions, nor did NP Maney tell Dr. Walker about
11  the plaintiff's stomach diagnosis of (GERD), that he has had constantly for over the past ten years, before he
12  convinced Dr. Walker to prescribe the plaintiff with numerous powerful Nsaid anti-inflammatory pain
13  medications that are known to be especially damaging to the (G.I.) tract, that are known to cause bleeding
14  ulcers, liver and kidney disease. NP Maney also failed to inform Dr. Walker about the plaintiff's diagnosis of
15  severe anemia and hypertension. This anemia diagnosis is what lead to the prison doctors ordering a
16  Colonoscopy for the plaintiff and when the Colonoscopy results were negative, that lead to the order for the
17  (EGD) study. The doctors were doing this to find the cause for the plaintiff's internal blood loss resulting in his
18  anemia diagnosis. There are several lab reports that have been done over the last few years, which show that
19  the plaintiff's anemia issues have been going on for several years. This anemia is severe enough that Dr. Gulick
20  prescribed ferrous sulfate on 2/4/21 and he changed this prescription to ferrous Gluconate on 4/7/21. The
21  plaintiff has had to take two different types of proton pump inhibitor stomach medication to keep his stomach
22  acid under control because of his long standing diagnosis of (GERD), because of his stomach condition.

23        84.   On June 28, 2021, NP Maney sent the plaintiff a medical response which stated; Reviewed
24  EGD report-Gastritis and Esophagitis without bleeding, Gastroparesis. Will follow-up recommendations for
25  Gastroparesis next week, more after TLC 6/29. Avoid excessive use of Nsaids (IBP, Naproxen, Celebrex, etc...)
26  All can cause Gastritis. This medical response proves that NP Maney was aware the plaintiff should not be
27  taking Nsaid anti-inflammatory medications for his severe pain because of his recent diagnoses on his stomach
28  and esophagus and the potential harm to his stomach, but yet NP Maney convinced Dr. Walker on August 3,
29  2021, who resides in Farmington, Connecticut, to recommend for plaintiff, three powerful Nsaids drugs called;
30  Diclofenac 75 mg twice daily, Indocin for break through pain, and can consider: Sulindac 150 mg twice daily
31  as well. The medication information facts for Diclofenac, warns that this drug may raise the chance of severe
32  and sometimes deadly stomach or bowel problems like ulcers and bleeding and the risk is greater in older
33  people and people who have had stomach or bowel ulcers or bleeding before. These problems may occur
34  without warning signs. This drug can raise the risk of heart attacks and stroke and these effects can be deadly

1    and can happen within the first week of using this drug. When NP Maney convinced Dr. Walker to recommend
2    the Diclofenac for the plaintiff, NP Maney knew of the plaintiff's severe anemia and his recent stomach
3    diagnosis. NP Maney knew that the plaintiff should not be taking this Nsaid drug with his stomach condition,
4    but yet he allowed Dr. Walker to recommend these Nsaids for the plaintiff's pain anyway. This action has the
5    appearance that NP Maney is trying to hurt the plaintiff's stomach intentionally. When plaintiff was finally
6    prescribed the Diclofenac on January 12, 2022, this medication did not come with a Medication Information
7    Fact Sheet. The plaintiff had to request one three times before he received one on February 6, 2022.

8            After the plaintiff read the medication information fact sheet, it was easy for him to understand why
9    his stomach was hurting him so much again after he started taking the Diclofenac. Then the plaintiff started
10   having allergy symptoms to this drug and he asked for the Diclofenac to be discontinued.

11           85.    On February 15, 2022, the plaintiff received a response from NP Maney, to his 2/10/22
12   healthcare request asking for his Nsaid medication to be switched back to Celebrex and discontinue
13   Diclofenac. NP Maney wrote: "Renewed Celebrex 200 mg twice a day, Long term use of Nsaids can impact
14   kidney function (lower GFR), increase risk of cardiovascular disease, cause (GI) bleeding and/or
15   inflammation. DOC has other chronic pain medications available. The plaintiff wrote NP Maney a letter that
16   was dated February 16, 2022, and told him, "His response to his 2/10/22 health care request seemed to
17   admonish him for requesting Celebrex instead on continuing to take that Diclofenac, when both are Nsaid
18   drugs. May I remind you that it was never my idea to start taking any Nsaid drugs, as this is what you and
19   Dr. Walker decided to give me. I am aware the Nsaids long term are bad for my health, but what choice do I
20   have? You, Dr. Gulick and the TLOC committee took all my other pain medications away from me almost two
21   years ago. I am suffering with severe joint pain and severe nerve pain in my lower extremities daily from my
22   spinal stenosis and pinched nerves in my lower lumbar spine. I need pain medications." The plaintiff asked
23   NP Maney, "What other pain medications does he have available other than Nsaid drugs that could treat his
24   severe pain?" NP Maney did not response to plaintiff's 2/16/22, letter.

25           86.    NP Maney's 2/10/22 response clearly shows he is aware of the harm these Nsaid drugs are
26   doing to the plaintiff stomach, but yet he wants to condemn the plaintiff for taking these Nsaids, when he
27   prescribed them. NP Maney knows plaintiff has the diagnosis of anemia, Gastritis, Esophagitis and
28   Gastroparesis and the fact the the (EGD) procedure was never completed because of plaintiff's Gastroparesis
29   and the (EGD) needs repeated because the doctors have not found the source of the plaintiff's internal bleeding
30   yet. NP Maney's attitude towards the plaintiff health and safety is a clear indicator that NP Maney would rather
31   harm the plaintiff rather than provide him with adequate medical care.

32           87.    On October 1, 2021, the plaintiff filed grievance #TRCI-2021-10-006 against NP Patrick
33   Maney for holding a pain specialist consult on August 3, 2021, with Dr. Joseph Walker III, and NOT allowing
34   the plaintiff to participate in his own pain specialist consult. Denying plaintiff the benefit of participating in his

1    own pain specialist consult, especially given the seriousness of the plaintiff's spinal condition and nerve pain,
2    opens up the door for corruption and abuse, especially since only NP Maney and Dr. Walker really know what
3    was said about plaintiff's pain symptoms and serious medical conditions on 8/3/21, since this consult was not
4    recorded. In his grievance, the plaintiff asked to be allowed a personal consult with a local Pain Specialist or
5    Orthopedic Surgeon, so he could truthfully and accurately explain his spinal injuries and nerve pain symptoms.
6    On October 5, 2021, the plaintiff received a grievance response from RN Cindy Dieter. She said, "ODOC has
7    consulted with the available pain specialist and any exploration with a new provider will be your responsibility
8    as an out of pocket expense. Due to the Covid-19 pandemic, our attention and the prioritization is directed
9    from DOC according to current State mandates. The current tier status affects how medical services are
10   rendered to the AIC's. We will continue to do our best to respond to your communications within DOC
11   guidelines."

12        88.    The TLOC recently denied the plaintiff a self-purchase of medical care request with Dr. Vadala
13   on 9/26/20, even though this had been previously paid for and arraignments had been made. The TLOC
14   committee told plaintiff that he could not self-purchase his own medical care because they wanted him to see
15   their doctor in the valley for treatment after the pandemic was over. This information is documented in the
16   completed grievance #TRCI-2020-10-037. The ODOC Health Services might as well said never. It appears as
17   if this covid-19 pandemic is never going away and the ODOC Health Services is using this pandemic to their
18   advantage in order to deny plaintiff adequate medical care. The plaintiff told Health Services that if they would
19   make an appointment for him with a Pain Specialist, that he would pay for it. ODOC Health Services told him,
20   "NO, that he would have to find his own doctor and make all the arrangements himself." At this point, the
21   ODOC Health Services is being arrogant in the way they are denying him adequate medical care and using
22   covid as their excuse. Even if plaintiff did everything they asked of him to get a self-purchase medical
23   appointment, they would still find a way to deny it. It is not normal practice for a patient to NOT participate in
24   their own pain specialist consult. This would never happen to a patient in the community.

25        89.    Plaintiff has sent in numerous healthcare request over the last few years reporting stomach
26   distress and requesting medical attention, including on: 8/5/21, 8/8/21 x2, 8/10/21, 8/14/21, 8/17/21, 8/18/21,
27   8/27/21, 9/2/21, 9/18/21, 9/30/21, 11/9/21, and 11/17/21. The plaintiff has made several requests for the
28   ODOC Health services to provide him with the Gastric Emptying Study, which needs to be done, so the (EGD)
29   procedure can be repeated. Health Services responded to his 12/19/21 kyte about this and said; "Provider
30   notified of your concern." In a 12/21/21 kyte to RN Dieter about the Gastric Emptying study, the response
31   states; "You are being scheduled for gastric emptying study. This was recently explained to you in your
32   grievance process, along with your pain medication concerns." The plaintiff received a medical response on
33   12/30/21 which states: "In regards to gastric emptying studies- scheduler is working on securing an appt for
34   you. Unfortunately with Covid, it is taking longer than expected."

90.     The plaintiff filed grievance #TRCI-2021-08-001, on July 29, 2021, over the way the Health
Services wanted to do the Gastric Emptying study on him in July 2021 without letting plaintiff talk to a doctor
first to discuss his serious fears about doing this procedure to him the way it was explained. The plaintiff stated
that he wanted a consult with Dr. Earl first before he did this (Gastric Emptying Study) procedure because he
had real fears about pain. The Health Services providers just sent plaintiff some information pages on Gastric
Emptying Studies that gave the plaintiff the impression that he had to lay on his back for 5 hours straight and
that was something that plaintiff can not do because of his serious back condition which would result in severe
back pain if he had to lay on his back for 5 hours straight. When it was later explained that he would not have
to lay on his back for 5 hours straight, then the plaintiff agreed to do the procedure. At that point, plaintiff
thought he was waiting to have the (EGD) procedure repeated, like Dr. Earl told him it needed to be done after
the first (EGD) procedure on June 23, 2021. The plaintiff received a grievance appeal response on November
16, 2021, by Dr. Roberts. He stated, "TRCI medical explained the procedure to you and let you know that you
will not be laying on your back for 5 straight hours. This procedure was ordered as a result of the (EMG) that
was done on June 23, 2021." Plaintiff did not have an (EMG) done on 6/23/21, he had an (EGD). The plaintiff
explained in his grievance appeal on November 28, 2021, that there was mixed messages relayed to him that
caused this confusion, but that he would like to get this procedure done so Dr. Earl could find out what is
wrong with his guts and why he has been so anemic. As of recent, Health Services has not followed through
with completing the doctors' order for the Gastric Emptying study procedure yet for the plaintiff. The cause of
plaintiff's anemia is still unknown.

91.     There was a lot of information in the plaintiff's medical file that documents his many
complaints of severe stomach acid problems, stomach pain and distress and his concern over stomach bleeding
causing plaintiff's anemia diagnosis, but yet NP Maney prescribed the Diclofenac on 1/12/22 to the plaintiff
anyway, knowing full well that this drug would hurt his stomach. The plaintiff believes that is why NP Maney
convinced Dr. Walker to recommend these powerful Nsaids to him and denied plaintiff the right to participate
in his own pain consult, to prevent plaintiff from telling Dr. Walker himself about his stomach problems,
anemia issues and severe nerve pain issues.

92.     The plaintiff has sent in many healthcare request to Health Services requesting adequate pain
medication for his severe nerve pain, even after this 8/3/21 pain specialist consult with Dr. Walker, including
on; 8/7/21, 10/27/21, 11/6/21, 11/15/21, 11/19/21, 11/23/21, 11/27/21, 11/29/21, 12/8/21, 12/23/21, 12/30/21,
1/2/22, 1/4/22, 1/7/22, 1/8/22, 1/12/22, 1/13/22, 1/15/22, 1/18/22, 1/19/22, 1/22/22, 1/30/22, 2/2/22, 2/3/22,
2/5/22, 2/7/22, 2/10/22, 2/15/22, 2/16/22, 2/22/22, and 2/27/22. Most of the responses plaintiff received from
Health Services state that they are waiting for more testing to be done on the plaintiff's back before they would
consider changing his pain medication regimen.

93.    When the plaintiff asked to see a doctor on 10/27/21, because he was experiencing severe nerve pain and needed pain medication, the response he received from Health Services stated; "You have an upcoming outside appointment." On 11/15/21, the plaintiff requested to see a doctor because he was experiencing severe nerve pain and he needed adequate pain medication. The response stated; "You have more testing to help you find the cause. Please work with these other providers to help you." Again, on 11/19/21, the plaintiff sent in a healthcare request informing them he was experiencing severe nerve pain and he need pain medication. The response on 11/22/21 stated; "You are continuing to receive care and work-ups. Today, you went out for an EMG/NCS – lumbar spine.

94.    On November 22, 2021, the plaintiff was transported to Dr. Paulo J. Cancado M.D. office in Kennewick, WA., for the nerve conduction study on his legs. Dr. Cancado found evidence of 1. L-5 spondylosis and radiculopathy and 2. Peripheral neuropathy. The Impression states: #1. Low back pain with radiation into the lower extremities with numbness and paresthesias in the feet. The EMG and nerve conduction studies showed evidence of: #1 A left ongoing S1 radiculopathy. #2 A right chronic L2 and/or L3 and/or L4 radiculopathies. #3 An Axonal Sensory Peripheral Neuropathy. #4 Prolongation of the left H reflex latency consistent with, but not diagnostic of a left S1 radiculopathy. Recommendations were: #1 Correlation with MRI of the lumbosacral spine and blood tests.

95.    The plaintiff sent in more healthcare requests asking to see a doctor now that the EMG/NCS were completed, which prove he has radiculopathies in his legs. (Nerve Pain) (The plaintiff was told earlier by the Health Services providers that they were waiting on proof of nerve pain from these tests, before they would consider prescribing neurontin to him again. But when the plaintiff tried to get his nerve pain medication neurontin restarted after Dr. Cancado's diagnosis, the Medical Care providers still refused to provide the plaintiff with any medication for his nerve pain.) The response from Health Services stated: "You are scheduled to see your provider soon." The plaintiff put in additional health care requests on 11/27/21, 11/29/21, 12/8/21 stating that he had severe nerve pain in his lower extremities and needed pain medication.

96.    On December 10, 2021, the plaintiff was seen by Nurse Practitioner Pamela Namenyi. This was the first time for the plaintiff to see this medical provider. NP Namenyi told the plaintiff that he was there to see her about his hypertension issues. The plaintiff told her that he had put in numerous request to see a doctor for his numerous medical issues and he has been waiting for months for a doctor's visit. The plaintiff told Ms. Namenyi about his back and neck injuries and the nerve pain that he suffers from in his legs and groin area as the result of his back injury. Plaintiff told her about the pinched nerves in his neck that was affecting his left arm causing pain and numbness. Plaintiff told her he was having severe muscle spasms in the middle of his back and on the left side of his neck. NP Namenyi said, that she had no doubt that he was experiencing severe nerve pain as the result of his back injuries. She said, from what she could see, the plaintiff has not been provided with any pain management medications at this time, other than Celebrex and she found that bazaar

1   given the seriousness of his spinal injuries. NP Namenyi asked the plaintiff why he was not on any pain

2   medications. Plaintiff said Dr. Gulick took all of his pain medications away from him because he said that I did

3   not need them anymore because there was nothing wrong with my back. NP Namenyi asked the plaintiff if Dr.

4   Gulick was some kind of a quack?

5         97.    The plaintiff told her that Dr. Gulick does not believe in giving pain medication to inmates,

6   regardless of how serious their back pain is and she probably already knows what kind of doctor the plaintiff

7   thinks he is, but that it was her job now to look over the medical evidence in his medical file and then judge for

8   herself if he has been getting adequate medical care for his severe nerve pain or not, based on all the evidence.

9   NP Namenyi said, "It says right here in you medical chart that you have already completed your consult with

10  the pain specialist. NP Namenyi asked the plaintiff how did that go and what did the pain specialist have to say

11  after you seen them. The plaintiff stated that he was not allowed to have a personal consult with the pain

12  specialist. NP Maney held a teleconference consult with the pain specialist himself without the plaintiff being

13  there, so NP Maney did all the talking for him and he really has no idea what NP Maney told the pain specialist

14  about his pain or physical condition, because from what the plaintiff learned from reading NP Maney's 8/3/21

15  progress notes, it appears that Maney told the Pain Specialist that there was nothing wrong with him and that

16  he was just fixated on his pain because of a mental illness. She seemed shocked after plaintiff told her that he

17  was not allowed to participate in his own Pain Specialist consult.

18        98.    NP Namenyi said, "Really, you were not allowed to participate in your own Pain Specialist

19  consult, that is the most bazaar thing that I have ever heard of before!" The plaintiff told NP Namenyi that he

20  could assure her that his back and neck injuries are real and not part of some mental illness. The plaintiff told

21  NP Namenyi that he recently had some back X-Rays in October and he has not seen a medical care provider

22  yet to go over the results of this with him. NP Namenyi found the report. She said, "For some reason Maney

23  only ordered scoliosis series X-Rays, that doesn't make since because he knew you had scoliosis already. In

24  this other report, it says right here that you have a lower broken screw in your back. You are going to need

25  some repair work to get this fixed. The plaintiff told her that he was told that they were not going to do

26  anything about the broken pedicle screw because it wasn't an emergency. NP Namenyi told plaintiff, "It says

27  right here that you have been scheduled to see a neurosurgeon because of the results from your Nerve

28  Conduction Study." She said, "That does not make much since to me either because you should be seen by an

29  Orthopedic Surgeon because you are going to be needing some work done to your back. She said she would be

30  taking plaintiff's medical care needs to the TLOC committee next week to discuss these issues and get their

31  approval for you to be seen by an Orthopedic Surgeon. The plaintiff told her that it does not make since for

32  him to be seen by an Orthopedic Surgeon before a lumbar MRI is done, because the surgeon will just say that I

33  need a lumbar spine MRI before they can make a diagnosis.

34

99.    NP Namenyi told plaintiff, "It says right here in your nerve conduction study report that the doctor recommended a lumbar MRI for you. I will discuss this with the TLOC also."

The plaintiff told NP Namenyi about "Dr. Gulick taking his nerve pain medication Neurontin and ultram away from him and neurontin was the only nerve pain medication he has ever used that actually helped with his type of nerve pain." NP Namenyi told plaintiff "That getting you put back on Neurontin might be difficult because in a Correctional Setting, the ODOC has had trouble with some inmates abusing it. I like Neurontin myself, I think it is a good pain medication and I used to prescribe it to my patients all the time. I will discuss this with the TLOC if I could get you put back on Neurontin. Have you ever taken baclofen before for your muscle spasms." The plaintiff said to NP Namenyi, "That he used baclofen for six years before Dr. Gulick and Dr. Roberts took the baclofen away from him also. Dr. Gulick told him that the reason why he was taking the baclofen away, was because baclofen stops working after 10 days of using it and so baclofen is not to be used on patients with chronic pain issues any longer than 10 days."

100.    NP Namenyi told plaintiff "That is not true and she asked him if it helped his muscle spasms before Dr. Gulick took this away from him." The plaintiff told NP Namenyi that baclofen did help some, especially for the spasms in the middle of his back. NP Namenyi told plaintiff that she would also "Ask the TLOC committee if she could get him put back on baclofen and that she would see if she could get him rescheduled for the Gastric Emptying Study that Dr. Earl wanted him to do." NP Namenyi and plaintiff talked some about his stomach pain, anemia and blood test results. NP Namenyi told plaintiff that "He would be hearing from Medical Services a lot in the near future because he was definitely on the ODOC's radar because of all his medical problems." NP Namenyi seemed genuinely concerned about the plaintiff's medical issues and her desire to help him.

101.    On December 14, 2021, NP Namenyi took her request for the plaintiff to be put back on baclofen and Gabapentin before the TLOC committee for his back pain and nerve pain. The TLOC committee denied her request to prescribe these medications to the plaintiff.

102.    In January 2022, the plaintiff purchased some copies of his ODOC medical records going back to July 2021. When he received the records that he ordered, he soon learned that NP Namenyi did not write anything down in his progress notes from his doctor's visit with NP Namenyi on December 10, 2021. The only evidence in plaintiff's ODOC medical records that document what NP Namenyi had considered for medical care for the plaintiff on 12/10/21, is his PHYSICIAN'S ORDERS notes from December 10, 2021. On his page, someone wrote 1. Cips x 3, 2. TLC-Gabapentin. There are stickers attached to this page showing that NP Namenyi outright prescribed Baclofen, for twice daily for the plaintiff for 3 months, ending on 3/9/22. Prescription #1625908. There were also stickers showing that Namenyi prescribed Lactulose and Cromolyn for the plaintiff, on this same day. The plaintiff remembers a sticker showing he was prescribed baclofen on 12/10/21, and it was placed in his Medication Administration Records (MARS) on Tuesday 12/14/ 2021.

1      103.    This gave plaintiff the impression that the TLOC had approved the baclofen for him. Then 3

2    days later on Friday December 17, 2021, a sticker was placed in his (MARS) records showing that the

3    baclofen had been Discontinued. The nurse at Med-line told plaintiff that the TLOC had voted to discontinue

4    his baclofen already. The plaintiff ordered a copy of his (MARS) records from December 2021 so he could

5    verify the dates on those stickers. It appears that the date on the discontinued sticker was changed from the 17th

6    to the 14th, but plaintiff can't prove it at this time. Plaintiff also learned that the TLOC committee denied

7    NP Namenyi's request to prescribe him Neurontin once again for his nerve pain. The non formulary medication

8    exception request dated 12/14/21, shows that the TLOC committee denied the request for Gabapentin and

9    Baclofen without citing a reason for denying these pain medications. There is no records that show if

10    NP Namenyi ever followed up on the other kinds on medical care that they both discussed for plaintiff on

11    December 10, 2021. The plaintiff heard NP Namenyi quit her Health Service's job shortly after this.

12      104.    On January 10, 2022, the plaintiff was called to Health Services to see the physical therapist

13    Mr. Jeff Snell. He told plaintiff that the doctors wanted him to do a pain specialist consult on him. Mr. Snell

14    told plaintiff that he is not qualified to prescribe pain medications, that he is just a physical therapist. He said,

15    "I could recommend that I think that you could benefit from pain medications given the pain that you are

16    reporting to me, but I can't do much more than that." Mr. Snell asked plaintiff if he regularly does any

17    exercises. The plaintiff told Mr. Snell that "If he even rides the exercise bike for even short periods of time,

18    this will cause the nerve pain in his legs to hurt so bad that his legs and groin will feel like they are on fire.

19    Ever since Medical Services took his pain medications away from him, he has not been able to do much in the

20    way of exercises. The plaintiff just hurts too much all the time anymore. Mr. Snell handed the plaintiff a sheet

21    of paper with some exercises on it and asked plaintiff for him to do what he could when he feels better.

22      105.    Mr. Snell said, that he would see the plaintiff again in a month. Plaintiff has not seen Mr. Snell

23    since. The plaintiff wrote RN Dieter a letter and asked her "Why did she send him to a physical therapist for a

24    personal pain specialist consult? That this did not make any sense, especially since Mr. Snell said that he was

25    not qualified to prescribe or recommend pain medications." RN Dieter responded, She denied sending the

26    plaintiff to Mr. Snell for a pain consult. She said the appointment was for the plaintiff to do some exercises.

27      The plaintiff obtained a copy of the ODOC Health Referral Outside Agency forms used to arrange this

28    appointment for this 1/10/22 consult with Mr. Snell. These forms state that Mr. Snell was asked to see plaintiff

29    for his chronic pain issues and to re-evaluate AIC's chronic pain concerns and make recommendations. This

30    act by NP Maney and RN Dieter shows that the ODOC are still trying to find ways to justify their actions for

31    having a pain consult without his participation and for taking the plaintiff's pain medications away from him.

32      106.    On March 7, 2022, the plaintiff was taken to the Kadlec Neuroscience Center in Richland

33    Washington for an examination with the Neurosurgeon Dr. Richard Cook, MD. Dr. Cook had all the images of

34    his back to do the exam but he was not provided with the images of his cervical spine.

107.    Dr. Cook put the images from the plaintiff's November 13, 2020, lumbar CT scan up on a
computer monitor. Dr. Cook started scrolling through the images to check different angles of plaintiff's spine.
Dr. Cook told plaintiff that he has retrolisthesis really bad at L5-S1 and that the spinal disc at L4-L5 and L5-S1
were completely gone. He scrolled some more through the images, then said, see this area in your lower spine,
there is absolutely no room for the nerves to come through this area. Your spinal canal is almost completely
pinched off. You are going to need surgery before you lose complete function of your lower extremities.

Dr. Cook was amazed that the plaintiff could still move his legs at all given how bad the images
looked on the monitor. Dr. Cook said, I am surprised that you have as much muscle mass in your legs as you
do given how bad the nerve damage is to your legs. Dr. Cook said, "You are looking at a very extensive
surgery here to fix your spine, I don't think we can do that here, that is something that you will need to get
done at University of Washington Medical School or Oregon Health and Science University. I don't know if
you can even do that given your current situation being in prison right now." Dr. Cook said, "these CT scan
images are almost two years old now, so I think it is safe for me to guess that your condition is a lot worse
since these CT scan images were taken. I am going to order a lumbar MRI for you so we can get some recent
images of your back and some new scoliosis X-Rays. Then we will see you again after those are done to figure
out where we are going to go from here." Dr. Cook asked the plaintiff about his nerve pain, where it was at,
what types of nerve pain does he have and how bad does it get.

108.    After the plaintiff explained all this to him, Dr. Cook agreed with the plaintiff that he must be
suffering with extreme nerve pain right now from his condition. Then the plaintiff told Dr. Cook that the prison
doctor's took his trammadol-ultram, neurontin-gabapentin and baclofen pain medications away from him two
years ago because they said there was nothing wrong with his back. The plaintiff asked Dr. Cook if he would
please prescribe him some pain medication because he has been living with horrible nerve pain and he has
been suffering. Dr. Cook told plaintiff that he could not prescribe him any pain medications because he was
not currently treating him. That was the duty of his primary care provider at the prison. But he could
recommend pain medications for your medical care provider to prescribed for you, like the Ultram and
Neurontin that you are requesting for your severe nerve pain in you lower extremities.

109.    Plaintiff then asked Dr. Cook if he has any images of his cervical spine because he has pinched
nerves in his neck also that are getting really bad and causing him severe pain in his neck and left arm and he
is losing the use of his left arm. Dr. Cook said that the prison doctors did not send any of your cervical spine
images to me for this appointment. Dr. Cook asked, "when was his last cervical spine MRI?" The plaintiff said
"It was in October of 2019. Dr. Cook said that was too old now, and he needed something more recent. I will
order for you to get a new cervical MRI also." Dr. Cook filled out the ODOC Health Referral outside agency
forms that were provided by TRCI Health services, and gave these to the officers in charge of transporting the
plaintiff.

110.    When the plaintiff returned to TRCI, the R&D officer gave these forms to plaintiff to deliver to Health Services for which he did. The plaintiff heard the nurses talking about Dr. Cook's recommendations for pain medications for the plaintiff of either Narco or Ultram and Neurontin. Plaintiff was in severe pain from this long medical trip that lasted for over 3 hours. The plaintiff asked the Nurses who were on duty if he could see a doctor because he was in severe pain and needed pain medication. The nurse told the plaintiff that NP Maney was currently considering prescribing plaintiff some pain medication because Dr. Cook had written a recommendation for your Medical Provider to do so. Then the nurses sent the plaintiff back to his housing unit telling him that they would call him back to Health Services after the Count was over with for him to see NP Maney. The plaintiff was not called back down to the TRCI Health Services after count, nor anytime thereafter for his back pain or severe nerve pain in his lower extremities.

111.    The plaintiff sent in a healthcare request after seeing the neurosurgeon Dr. Cook on 3/7/22, asking to see a doctor because he needed pain medication for his severe nerve pain and that Dr. Cook had just recommended the pain medications Ultram or Narco and Neurontin for the plaintiff to treat his severe nerve pain upon finishing his examination of the plaintiff. On 3/9/22, plaintiff received a 3/8/22 response from NP Maney, which stated: "TLC recommends pain medications per pain consult recommendations." This response by NP Maney completely ignores the advice of Dr. Cook, a medical specialist who actually examined the plaintiff's injuries by studying his diagnostic CT scan and X-Ray images and discussing the plaintiff's medical history with him in order to learn numerous details about the seriousness of plaintiff's spinal condition and overall health before Dr. Cook made his decision that the plaintiff needed those pain medications he recommended for his severe nerve pain. Dr. Cook said that he had no doubt that the plaintiff was suffering from severe nerve pain in his lower extremities after looking at the plaintiff's 11/13/20 Lumbar CT scan images. Dr. Walker, the pain specialist that NP Maney consulted on 8/3/21 about pain management medication for the plaintiff, did not have the benefit of being able to study the plaintiff's diagnostic images of his lumbar CT scans and spinal X-Rays or learn important necessary details about the plaintiff's medical history, which a doctor really needs, in order to make an educated decision and/or diagnosis on the right type of care the plaintiff really needs to treat his nerve pain symptoms for his serious medical condition.

112.    According to Dr. Cook, the plaintiff's nerves to his legs are pinched so bad that he was surprised that the plaintiff was able to move is legs or have any muscle mass left on his legs. What is even more ironic about the 3/8/22 response from NP Maney, is that NP Maney claims that the TLOC committee is only following the recommendations of Dr. Walker, but yet NP Maney and the TLOC committee has never followed the recommendations of Dr. Walker, because NP Maney has only prescribed the plaintiff one of the drugs that Dr. Walker recommended, which was the Diclofenac, and Dr. Maney waited until January 12, 2022, to do so. The plaintiff had to stop taking the Diclofenac because he had a bad reaction to it and it was tearing up his stomach.

1      113.    The TLOC committee denied Dr. Walker's recommendations to prescribed the plaintiff the

2  other two Nsaid drugs, Indocin and Sulindac, for his pain. This is probably a good thing, because the plaintiff

3  believes that if the TLOC committee prescribed the plaintiff Diclofenac, Indocin and Sulindac, all at the same

4  time, this 3 drug combination would cause the plaintiff a bleeding Ulcer and severe stomach distress,

5  especially in light of the plaintiff's stomach diagnosis of Gastritis, Esophagitis and Gastroparesis. That three

6  Nsaid drug combination would of likely killed the plaintiff if he took these 3 drugs at the same time and he

7  believes the ODOC Health Services is just waiting for the right time to hurt the plaintiff by prescribing him

8  medications that they know will hurt him.

9      114.    The March 8, 2022, decision to deny the plaintiff the pain medications that were

10  recommended by Dr. Cook, by NP Maney and the TLOC committee, demonstrates that these TLOC members

11  are doubling down on their cruelty and showing their hatred for the plaintiff once again because they do not

12  want to provide the plaintiff with the surgeries he needs. AS of the time of this filing, NP Maney and the

13  ODOC Health Services Medical providers are still refusing to provide the plaintiff with adequate medical care

14  by refusing to provide plaintiff with pain medications that were recommended by the neurosurgeon Dr. Cook,

15  and many other past ODOC Medical Providers, that could help the plaintiff's severe nerve pain, if only a little.

16  The only pain medication the plaintiff is currently being prescribed, is the Nsaid Celebrex, which does not help

17  the plaintiff's severe nerve pain at all and just mostly makes his stomach upset. The TLOC committee made

18  Celebrex a "Controlled By Staff" medication on January 11, 2022 and February 14, 2022, so the plaintiff

19  would have to take this medication at med-line, even though most inmates get to keep drugs like Celebrex in

20  their Cells, just like the plaintiff had been doing for years before the TLOC committee made this change.

21      115.    The TLOC claimed this changed was to "check for adherence" to make sure the plaintiff was

22  taking his Celebrex. On March 19, 2022, when the plaintiff went to med-line to get his dose of Celebrex,

23  health services did not have any Celebrex to give him, because the nurses had not ordered any medication

24  refills before the Celebrex pill container went empty. This caused the plaintiff to go a week without the

25  Celebrex. This action by Health Services was no accident and they are really doing this on purpose because

26  they are retaliating against plaintiff because of the plaintiff's grievances and writing letters to an attorney over

27  being denied adequate medical care. If the plaintiff had the Celebrex in his Cell, he could of placed an order

28  for a medication refill before the Celebrex container became empty. The TRCI health Services management

29  are currently trying to hurt the plaintiff in every which way they can image in order to make him suffer. The

30  TLOC committee and NP Maney believe that because the plaintiff has a long prison sentence that he does not

31  deserve of proper medical care and that is why they will not provide plaintiff with the pain medications that

32  were recommended by the neurosurgeon Dr. Cook on 3/7/22.

33      116.    The plaintiff believes that the Celebrex is making his Gastritis, Esophagitis, and Gastroparesis

34  worse, and ODOC Health Services Medical Care providers are aware of this and they just do not care if the

1    plaintiff is suffering with severe nerve pain, stomach pain or bleeding internally. At this time, Celebrex is the
2    only pain medication that ODOC Health Services will provide the plaintiff that does not cause him even more
3    severe side effects that plaintiff has had with most other Nsaid drugs he has tried in the past. NP Maney is even
4    refusing to provide the plaintiff with pain medication before he sends plaintiff out on medical transport, which
5    requires the plaintiff to sit up for long periods of time which causes the plaintiff to experience extreme nerve
6    pain from his nerves being pinched off in his low back when he sits up. NP Maney is aware of the plaintiff's
7    serious spinal condition that causes his nerves to become severely pinched when he sits up, but NP Maney
8    refuses to provide the plaintiff with pain medications anyway because NP Maney and the TLOC committee
9    enjoys making the plaintiff suffer.

10    117.    Even though Dr. Roberts said that NP Maney was the plaintiff's primary medical care provider
11    and NP Maney has been writing all his medication prescriptions since June of 2021, the plaintiff has not had a
12    doctors visit with NP Maney in two years and even then it only lasted 5 minutes at most.

13    In April 2021, NP Maney came into the room and watched the visit between the plaintiff and Dr.
14    Gulick, but he only stayed about 5 minutes, of the near 45 minute meeting.

15    118.    It appears that NP Maney is trying to avoid the plaintiff because he wants to pretend that he
16    has no knowledge of the plaintiff's serious medical conditions, as a legal cover, so he can continue to abuse the
17    plaintiff. This fact that NP Maney is making medical decisions for the plaintiff, but yet refusing to exam him,
18    shows his deliberate indifference towards the plaintiff by itself, but there is a darker conspiracy going on here.

19    119.    Dr. Warren Roberts practiced as a Neurosurgeon before he became employed by the O.D.O.C.
20    In his medical profession, Dr. Roberts had to learn how to read X-Rays, MRI's and CT scans. Dr. Roberts had
21    in his possession, a copy of plaintiff's 11/13/20 lumbar CT scan images since shortly after those images were
22    taken. If Dr. Cook could easily see that the plaintiff has a severe nerve impingement in his low back by using
23    the 11/13/20 lumbar CT scan images, then that means Dr. Roberts would had reviewed the plaintiff's 11/13/20
24    CT scan images back in November of 2020, because he had a copy of these CT scan images and therefore had
25    this same knowledge about plaintiff spine, but a much longer time period of 16 months sooner before Dr. Cook
26    had access to and was able to study these 11/13/20 lumbar CT scan films. Even though Dr. Roberts had this
27    knowledge of the plaintiff's serious medical condition, Dr. Roberts refused to act or to help or to treat the
28    plaintiff's severe nerve pain symptoms in anyway, caused by his severe nerve impingement in his low back.

29    120.    Dr. Warren Roberts, Dr. Garth Gulick, NP Patrick Maney and the ODOC Therapeutic Level
30    of Care (TLOC) Committee employees are responsible for the plaintiff's medical care, health and safety, but
31    instead they have been, and still are, physically torturing the plaintiff by refusing to treat his severe nerve pain
32    and serious medical conditions. Just because all elective surgeries have been postponed because of the Covid-
33    19 pandemic, that is not a legal justification to just ignore the plaintiff's severe pain symptoms while he has to
34    wait for this pandemic to end before he can get the surgeries and medical care that he needs.

121.     These ODOC defendant's are grossly deliberately indifferent to the plaintiff's serious medical needs. The plaintiff needs this Court's help and guidance to remedy this terrible injustice and violations of the plaintiff's Civil Rights under the Eighth Amendment of the United States Constitution. The plaintiff believes that it is absolutely necessary for him to be placed into protective custody, either in a prison out of the State of Oregon or in the federal prison in Sheridan Oregon, in order to protect his health and safety from these corrupt Prison Officials who are presently employed by the Oregon Department of Corrections, so the plaintiff can get the medical treatments that he most desperately needs without worrying about being harmed again by these ODOC defendants who have shown their willingness to harm and injure the plaintiff.

122.     The plaintiff is severely disabled and qualifies as a class member under the Americans with Disabilities Act of 1990 § 202 and 29 U.S.C.A. § 784. The defendants refusal to provide the plaintiff with adequate medical care and pain medications which has kept the plaintiff in a constant state of severe pain which forces him the lay down on his bed a lot, which has thereby restricted his capacity to function and has prevented him from being able to enjoy hobbies, recreational activities, prison jobs, incentive meals and leisure time activities which are commonly enjoyed by average prisoners who are not disabled. The defendant's failure to provide the plaintiff with adequate medical treatment, including pain medication, has Restricted his physical capacity to function which has prevented him from being able to participate in recreational activities such as art work, gaming and the like, which has violated of his U.S. Constitutional Rights under the American's with Disabilities Act of 1990 § 202 and 29 U.S.C.A. § 794, and the Eighth Amendment of the United States Constitution, 42 U.S.C. § 1983.

123.     The O.D.O.C defendant's are aware of plaintiff's physical condition and have caused further deterioration of his physical condition due to the lack of adequate medical care, diagnosis and treatment of his serious medical conditions. Defendant's consciously decide to withhold adequate medical treatment and pain medications that are known to be effective in pain management and to protect the health and safety of the plaintiff, and these actions and/or inaction by the defendant's were in violation of the plaintiff's constitutional right to adequate medical care which is guaranteed under the Eighth Amendment. The Defendant's refusal to provide medically necessary treatments for the plaintiff's serious medical condition has caused the plaintiff to suffer excruciating and debilitating pain which amounts to physical torture and cruel and unusual punishment.

124.     The Defendant's outrageous conduct and intentional infliction of emotional distress has caused the plaintiff to suffer from severe mental anguish which has deteriorated significantly because of the severe nerve pain with no prospect of relief in sight. The plaintiff has been injured by these O.D.O.C. Defendant's failure to treat the plaintiff's severe pain caused by a serious medical spinal condition which has resulted in causing the plaintiff substantial pain that has significantly affected the plaintiff's daily activities, and has restricted his capacity to participate in activities and this has caused him anxiety as the result of the Defendant's refusal to provide the plaintiff with adequate medical care or at least provide medical treatment for

Page - 41 of   47    CIVIL RIGHTS COMPLAINT   42 U.S.C. §  1983,   29 U.S.C.A  § 794

1    his severe back and nerve pain and severe nerve pain in his lower extremities.

2

3        125.        Civil Rights Complaint 42 U.S.C. § 1983, 29 U.S.C.A. § 794

4                                **FIRST CLAIM FOR RELIEF**

5        Violations of the Eighth Amendment ( 42 U.S.C. § 1983, Gross Negligence, intentional infliction of

6    emotional distress and mental anguish – against Dr. Garth Gulick )

7

8        126.        Plaintiff re-alleges all prior paragraph as though fully set forth herein and incorporates them by

9    reference.

10        127.        Dr. Garth Gulick was deliberately indifferent to plaintiff-Forbess's serious medical needs by

11    failing to provide medically and constitutional adequate treatment for the plaintiff's severe chronic pain and

12    muscle spasms.

13        128.        Dr. Gulick's treatment of the plaintiff violated his right to be free from cruel and unusual

14    punishment under the Eighth Amendment of the United States Constitution.

15        129.        Dr. Gulick's failure to provide Constitutionally adequate medical care is still ongoing and the

16    plaintiff is entitled to equitable relief including an injunction requiring Gulick to provide adequate medical

17    care and a declaration that Dr. Gulick's prior treatment of plaintiff is Constitutionally inadequate.

18        130.        As a result of Dr. Gulick violating the plaintiff's Constitutional rights, the plaintiff suffered

19    severe physical pain and muscle spasms, mental anguish, anxiety and fear about his medical condition,

20    intentional infliction of emotional distress and restricted capacity, and he will incur future economic damages.

21    Accordingly, the plaintiff is entitled to economic and non-economic damages against Dr. Gulick and all the

22    other defendants in an amount to be determined at trial for the violations of 42 U.S.C. § 1983, punitive

23    damages, and the plaintiff's attorney fees and cost pursuant to 42 U.S.C. § 1988.

24        131.        Dr. Gulick's actions were malicious, deliberate, intentional, and embarked upon with the

25    knowledge of, or in conscious disregard of, the harm that would be inflicted upon the plaintiff. As a result of

26    said intentional conduct, the plaintiff is entitled to punitive damages in an amount sufficient to punish

27    defendants and to deter others from like conduct.

28        132.        The plaintiff's U.S. Constitutional Rights have been violated under the Eighth and Fourteenth

29    Amendments of the United States Constitution and pursuant to 42 U.S.C. § 1983 analyzing under 28 ALR Fed.

30    279 (1976), citing Criminal Law 1213.10 (1,3), Estelle v. Gamble, 429 U.S. 97, 103 (1976); and also the

31    Plaintiff's Rights were violated under Article 1, § 13,15 and 16 of the Oregon Constitution, and ORS 423.020;

32    (see: Penrod/Brown v. Cupp, 283 Or. 21, 581 P.2d 934 (1978), because the defendants denied and conspired to

33    deny the plaintiff from receiving adequate medical treatment for his very serious cervical and lumbar spine

34    medical conditions which has resulted in severe back and neck pain and muscle spasms and severe nerve pain

1   in his lower extremities and left arm. The plaintiff's back and neck conditions are considered a serious medical

2   condition under the Oregon State Constitution and the United States Constitution. Damages for intentional

3   infliction of emotional distress are an actionable injury without showing physical injury, if the negligent

4   conduct infringed upon a "legally protected interest. See; (Curtis v. MRI Imaging Services II, 148 Or. App.

5   607, 941 P2d 602 (1997)) and (Hammond v. Central Lane Communication Center, 816 P.2d. 593 (1991)).

6

7                                   **SECOND CLAIM FOR RELIEF**

8                              Violations of the Eighth Amendment

9            (42U.S.C.§ 1983, Gross Negligence, Intentional infliction of emotional distress and

10                restrictive capacity – against Nurse Practitioner Mr. Patrick Maney)

11

12       133.      Plaintiff re-alleges all prior paragraphs as though fully set forth herein.

13

14       134.      Mr. Maney, NP, was deliberately indifferent to the plaintiff's-Forbess's serious medical needs

15   by failing to provide medically and constitutionally adequate treatment for the plaintiff's severe chronic and

16   acute pain and muscle spasms.

17       135.      Mr. Maney, NP, treatment of the plaintiff has violated his right to be free from cruel and

18   unusual punishment under the Eighth Amendment of the United States Constitution.

19       136.      Mr. Maney, NP, failure to provide Constitutionally adequate medical care is ongoing and the

20   plaintiff is entitled to equitable relief including an injunction requiring Mr. Maney to provide the plaintiff with

21   adequate medical care and a declaration that Mr. Maney's prior treatment of the plaintiff is Constitutionally

22   inadequate.

23       137.      As a result of Mr. Maney violating the plaintiff's Constitutional Rights, the plaintiff has

24   suffer severe physical pain and muscle spasms, mental anguish, intentional infliction of emotional distress,

25   anxiety and fear about his medical condition and restrictive capacity, and as such the plaintiff will incur future

26   economic damages. Accordingly, the plaintiff is entitled to economic and non-economic damages against the

27   defendants in an amount to be determined at trial for violations of 42 U.S.C. § 1983, gross negligence and

28   intentional infliction of emotional distress and the plaintiff is asking for punitive damages and his attorney fees

29   and cost pursuant to 42 U.S.C. § 1988.

30       138.      Mr. Maney's actions were malicious, deliberate, intentional, and embarked upon with the

31   knowledge of, or in conscious disregard of, the harm that would be inflicted upon the plaintiff. As a result of

32   said intentional conduct, the plaintiff is entitled to punitive damages in an amount sufficient to punish

33   defendants and others from like conduct.

34

1                              **THIRD CLAIM FOR RELIEF**

2        Violations of the Eighth Amendment and violations of the American's with Disabilities Act 1990 § 202.

3            (( 42 U.S.C. § 1983, 29 U.S.C.A. § 794) Deliberate Indifference, gross negligence, intentional

4    infliction of emotional distress and restrictive capacity,- and violations of the American's with Disabilities Act

5    1990 § 202. - against all the above listed ODOC defendants)

6        139.      Plaintiff re-alleges all other prior relevant paragraphs as if fully set forth herein.

7        140.      The above listed ODOC defendants were deliberately indifferent in how they have been

8    providing medical care to plaintiff-Forbess, by failing to provide medically and Constitutionally adequate

9    medical treatment for his severe spinal nerve pain, muscle spasms, Anemia, Gastritis, Esophagitis,

10   Gastroparesis, stomach pain, and including adequate treatment for his severe pain and muscle spasms from his

11   cervical and lumbar spinal injuries and the defendants knowingly attempted to hide the plaintiff's true physical

12   condition and severe pain and muscle spasms symptoms so they could continue to physically torture the

13   plaintiff and so they would not have to provide the plaintiff with the adequate medical care that he needs.

14       141.     The remaining ODOC defendant's knew or should have known that by failing to provide

15   medically and Constitutionally adequate treatment for the plaintiff's severe spinal nerve pain, muscle spasms,

16   Anemia, Gastritis, Esophagitis, and Gastroparesis, and stomach pain, that they would be causing the plaintiff

17   serious harm. The defendant's knew that their failure to provide medically and Constitutionally adequate

18   effective pain medication for the plaintiff severe spinal nerve pain and muscle spasms and by only prescribing

19   the plaintiff with Nsaid drugs instead, that their actions would only further injure the plaintiff's stomach and

20   esophagus and contribute to his stomach bleeding and anemia medical conditions and they would not

21   adequately treat his severe pain. These defendant's knew they were harming the plaintiff by prescribing him

22   large amounts of Nsaid drugs instead of prescribing him with his normal pain medications Ultram-Trammadol

23   and Neurontin-Gabapentin, that were known to help his severe nerve pain and that the defendant's actions or

24   inaction would result in causing the plaintiff to suffer physical harm and severe physical pain and suffering,

25   severe mental anguish, intentional infliction of emotional distress and restrictive capacity.

26       142.     The above listed ODOC defendants failed to use reasonable care in providing medical care to

27   the plaintiff as alleged above and their conduct demonstrated a deliberate indifference and gross negligence

28   towards the plaintiff's serious medical needs.

29       143.     The above listed ODOC defendants owes the plaintiff a higher standard of medical care

30   because of the nature of incarceration. As a ward of the State, these ODOC defendants managed many aspects

31   of the plaintiff's health care, and decide when a request for a medical treatment should be granted. Had the

32   plaintiff been a free person, he would have sought the appropriate treatment immediately and had some form

33   of treatment rendered. However, as an incarcerated person, when the plaintiff sought treatment while in the

34   ODOC facility where he is currently being held, his pleas for medical treatment were unmet.

1    The above listed ODOC defendants voluntarily took the custody of the plaintiff under circumstances

2    such as to deprive the plaintiff of normal opportunities for protection and created a non-delegable duty to

3    ensure that the plaintiff was able to access adequate medical care while incarcerated. The ODOC defendant's

4    did not meet their obligation to provide for "healthcare, including medical, dental, mental health care and

5    pharmacy services, that compl-[ies] with appropriate professional standards." OAR 291-124-0016(1)(c).

6

7    144.    The ODOC defendant's conduct was unreasonable in light of the risk of harm to the

8    plaintiff. The ODOC defendant's controlled all aspects of the plaintiff medical care. The plaintiff severe pain

9    could have been adequately treated to relieve some of his suffering with a number of available treatments,

10    including Ultram and Neurontin, (A.K.A., Trammadol and Gabapentin.) But instead of providing appropriate

11    medical care for the plaintiff's injuries and severe pain as required by State and federal law, the defendant's

12    instead prescribed the plaintiff with large amounts of Nsaid anti-inflammatory drugs which the defendant's

13    knew full well that these Nsaid drugs would not adequately relieve the plaintiff's type of spinal cord

14    impingement nerve pain, but at the same time the defendant's knew that these Nsaid drugs would seriously

15    hurt the plaintiff's esophagus and stomach, and contribute to his anemia. These horrific actions by the

16    defendants, demonstrate extreme deliberate indifference, especially in light of the results from the plaintiff's

17    June 23, 2021, (EGD) study that diagnosed the plaintiff as having Gastritis, Esophagitis and Gastroparesis and

18    the earlier lab reports that also diagnosed the plaintiff as having severe untreated anemia for several years, so

19    much so, that the plaintiff was prescribed ferrous sulfate pills twice a day on February, 4, 2021. The Plaintiff's

20    diagnosis of being anemic, resulted in the following physician order's for the plaintiff's 4/28/21 colonoscopy

21    and the 6/23/21 (EGD) study. Those procedures were done to find the cause of the plaintiff's anemia, and all

22    the while the defendant's were offering the plaintiff only large amounts of Nsaid anti-inflammatory drugs for

23    his severe pain, knowing full well that the plaintiff should not take Nsaid drugs with his diagnosis of Gastritis

24    and Esophagitis, and knowing the plaintiff would take these Nsaid drugs because they knew the plaintiff was

25    suffering from severe pain and he would take these Nsaids because they knew that the plaintiff desperate for

26    anything that might help his pain. The defendant's knew the risk of harm that could happen to the plaintiff if he

27    took these Nsaid drugs and could cause the plaintiff internal bleeding and cause him severe pain and stomach

28    distress and could even possibly kill him from blood loss, but yet the defendants made the plaintiff take these

29    Nsaid drugs for his severe nerve pain anyway by telling the plaintiff that they took away his Ultram and

30    Neurontin that were helping his pain, because the Oregon Health Authority passed a law making those drugs

31    illegal, but as it turns out, this was not true either. The ODOC defendant's unreasonably disregarded the

32    plaintiff's pleas for medical assistance and ignored his serious medical conditions.

33

34

145.     As a consequence of the ODOC defendant's deliberate indifference, the plaintiff suffered physical harm and severe physical pain and suffering, muscle spasms, mental anguish, intentional infliction of emotional distress and restrictive capacity. The plaintiff will likely require future treatment as a result of the ODOC defendant's deliberate indifference and may suffer long-term physical deterioration also as a result of the ODOC defendant's deliberate indifference towards the plaintiff serious medical needs.

146.     Just because the Oregon Governor Ms. Kate Brown declared a "State of Emergency" in March 2020, because of the Covid-19 pandemic, which gave authority to the Oregon Department of Correction to stop all elective surgeries and outside medical appointment for medical conditions that were considered non-life threatening, that did not give these ODOC defendant's the right to take his pain medications away from him and try to harm him because he has very serious medical conditions that will require several surgeries and will cost the Department of Corrections substantial amounts of money, that did not give the ODOC defendants the legal authority for the ODOC defendant's actions in this matter. The ODOC defendants actions were unconstitutional in violation of the Eighth Amendment.

147.     The ODOC defendant's conduct has Restricted the plaintiff's Capacity to function which has caused harm to the plaintiff by violating his Rights under the United States Constitution, to wit: the American's with Disabilities Act of 1990 § 202 and 29 U.S.C.A. § 794.

148.     The ODOC defendant's conduct was a substantial factor in causing harm to the plaintiff.

149.     As a result of the ODOC defendant's conduct, the plaintiff suffered economic and non-economic damages in an amount to be proved at trial.

150.     The plaintiff is entitled to a prevailing party fee, his cost, and disbursements.

**PRAYER FOR RELIEF**

**WHEREFORE**, the plaintiff prays for a judgment against the defendants as follows:

a.)     An award of economic damages, in an amount to be fixed by the jury at the time of trial, here alleged to be $50,000;

b.)     An award of non-economic damages, in an amount to be fixed by the jury at the time of trial, here alleged to be $850,000;

An award of punitive damages, in an amount to be fixed by the jury at the time of trial, here alleged to be $2,000,000;

d.)     For reasonable attorneys' fees and cost pursuant to 42 U.S.C. § 1988;

e.)     An injunction order Dr. Gulick, Mr. Maney, NP, and ODOC Medical Director Dr. Roberts to provide adequate medical care and a declaration that Dr. Gulick's, Mr. Maney's, and Dr. Roberts' prior medical treatment is Constitutionally inadequate; and

f.)     For any such other further relief as may appear just and appropriate.

The plaintiff-FORBESS demands a trail by jury.

1

2       I, Steven Forbess, depose and state: Under federal Rule of Civil Procedure 11, by signing below, I

3   certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for

4   an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

5   (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing

6   law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have

7   evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint

8   otherwise complies with the requirements of Rule 11.

9

10      I agree to provide the Clerk's Office with any changes to my address where case-related papers may be

11  serviced. I understand that my failure to keep a current address on file with the Clerk's Office may result in the

12  dismissal of my case.

13

14      Date of Signing:  March 23rd, 2022

15

16      Signature of Plaintiff, Pro se,    _____

17      Printed Name of Plaintiff, Pro se :    Steven Charles Forbess

18      Prison Identification #  05968485

19      Prison Address:            82911 Beach Access Road

20      City, State, Zip Code:  Umatilla, Oregon  97882

AO 399 (Rev. 10/95)

# WAIVER OF SERVICE OF SUMMONS

TO: _STEVEN CHARLES FORBESS_
(NAME OF PLAINTIFF'S ATTORNEY OR UNREPRESENTED PLAINTIFF)

I, _Oregon Dept. of Corrections, Dr. Warren Roberts_ et. al.,, acknowledge receipt of your request
(DEFENDANT NAME)

that I waive service of summons in the action of _42 U.S.C. § 1983, 29 U.S.C.A. § 794_,
(CAPTION OF ACTION)

which is case number _unKnown_ in the United States District Court
(DOCKET NUMBER)

for the _Pendleton Division_ District of _Oregon_.

I have also received a copy of the complaint in the action, two copies of this instrument, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service of a summons and an additional copy of the complaint in this lawsuit by not requiring that I (or the entity on whose behalf I am acting) be served with judicial process in the manner provided by Rule 4.

I (or the entity on whose behalf I am acting) will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons.

. I understand that a judgment may be entered against me (or the party on whose behalf I am acting) if an

answer or motion under Rule 12 is not served upon you within 60 days after _____,
(DATE REQUEST WAS SENT)

or within 90 days after that date if the request was sent outside the United States.

_____          _____
(DATE)                                          (SIGNATURE)

Printed/Typed Name: _____

As _____ of _____
(TITLE)                                   (CORPORATE DEFENDANT)

## Duty to Avoid Unnecessary Costs of Service of Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain parties to cooperate in saving unnecessary costs of service of the summons and complaint. A defendant located in the United States who, after being notified of an action and asked by a plaintiff located in the United States to waive service of summons, fails to do so will be required to bear the cost of such service unless good cause be shown for its failure to sign and return the waiver.

It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the action has been brought in an improper place or in a court that lacks jurisdiction over the subject matter of the action or over its person or property. A party who waives service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later object to the jurisdiction of the court or to the place where the action has been brought.

A defendant who waives service must within the time specified on the waiver form serve on the plaintiff's attorney (or unrepresented plaintiff) a response to the complaint and must also file a signed copy of the response with the court. If the answer or motion is not served within this time, a default judgment may be taken against that defendant. By waiving service, a defendant is allowed more time to answer than if the summons had been actually served when the request for waiver of service was received.

## CERTIFICATE OF SERVICE

CASE NAME: _Steven C. Forbess_ v. _Oregon Department of Corrections_

CASE NUMBER: (if known) _____

COMES NOW, _Steven Charles Forbess_, and certifies the following:

That I am incarcerated by the Oregon Department of Corrections at Two Rivers Correctional Institution (TRCI).

That on the 25th day of _March_, 20 22, I personally gave Two Rivers Correctional Institution's e-filing service A TRUE COPY of the following:

_Civil Cover Sheet_
_Civil Rights Complaint 42 U.S.C. § 1983_
_Application to Proceed in Forma Pauperis_
_Certified true copy of 6 month Trust Account Statement_
_Plaintiffs motion for Appointment of Volunteer Counsel_
_Affidavit in Support of Plaintiffs motion for Appointment of Volunteer Counsel_
_Certificate of Services and True Copy_
_WAIVER OF SERVICE OF SUMMONS_

_____
(Signature)

Print Name _Steven Charles Forbess_

S.I.D. No: #5968485

_82911 Beach Access Rd, Umatilla, OR. 97882_

Page 1 of 1 —Certificate of Service